

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-7-2003

# USA v. Brennan

Precedential or Non-Precedential: Precedential

Docket 01-3148

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Brennan" (2003). *2003 Decisions.* Paper 598.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/598

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 7, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3148

UNITED STATES OF AMERICA

v.

ROBERT E. BRENNAN,

*Appellant*

On Appeal From the United States District Court
For the District of New Jersey
(Crim. No. 00-cr-490)
District Judge: Honorable Garrett E. Brown, Jr.

Argued January 9, 2003

Before: SCIRICA, BARRY and SMITH, *Circuit Judges*

(Opinion Filed: April 7, 2003)

Lisa Van Hoeck, Esq. [Argued]
Office of Federal Public Defender
22 South Clinton Avenue
Station Plaza No. 4, Fourth Floor
Trenton, New Jersey 08609

Counsel for Appellant,
Robert Brennan

George S. Leone
Office of United States Attorney
970 Broad Street, Room 700
Newark, New Jersey 07102-2535

Glenn J. Moramarco [Argued]
Office of United States Attorney
Camden Federal Building &
 Courthouse
401 Market Street
P.O. Box 2098, 4th Floor
Camden, New Jersey 08101

   Counsel for Appellee,
   United States of America

---

## OPINION OF THE COURT

---

SMITH, *Circuit Judge*:

I. *Introduction*

A jury convicted appellant Robert E. Brennan of seven counts of money laundering and bankruptcy fraud on April 11, 2001. On appeal, Brennan contends that this conviction should be reversed because of certain trial errors. He also asserts that the District Court made several sentencing errors. For the reasons set forth below, we will affirm.

II. *Facts and Procedural History*

Robert Brennan has a long history of improper and fraudulent activities in the securities industry. In 1974, he was suspended from selling mutual funds when his improper activities were brought to the attention of the Securities and Exchange Commission ("SEC"). Brennan later founded First Jersey Securities, Inc. ("First Jersey") which served as a brokerage and underwriter. The SEC brought administrative proceedings against Brennan and First Jersey for violation of federal securities laws in 1978 and sought injunctive relief in 1983. These proceedings were settled, but on October 31, 1985 the SEC once again sued Brennan and First Jersey for new fraudulent market

activities and stock manipulation. This suit was pending for almost ten years. Finally, on July 14, 1995, the United States District Court for the Southern District of New York entered judgment against Brennan and First Jersey, and ordered that they discharge $22,288,099 in profits gained from their fraudulent activity and pay prejudgment interest in the amount of $52,689,894. *SEC v. First Jersey Securities, Inc.*, 890 F. Supp. 1185 (S.D.N.Y. 1995), *aff'd in part, rev'd in part*, 101 F.3d 1450 (2d Cir. 1996).

Just one month before the adverse ruling, in June of 1995, Brennan met in New Jersey with Peter Bond, the Chief Executive of Valmet Group ("Valmet"), a company based in the Isle of Man which advised and assisted individuals in shielding their assets from potential creditors. Brennan delivered to Bond a briefcase full of New York State and New York City bearer bonds with a total face value of $3,975,000.00, and asked him to use the bonds to set up a "dummy" trust which would identify someone other than Brennan as the settlor. Bond flew back to the Isle of Man with the bonds, and upon return, placed them in a cabinet in his office.

On August 7, 1995, a few weeks after the judgment was entered in the Southern District of New York, Brennan filed for bankruptcy protection in the United States Bankruptcy Court for the District of New Jersey under Chapter 11 of the Bankruptcy Code. Brennan failed to disclose his ownership of the bearer bonds in his bankruptcy petition or the attached schedules. On September 4, 1995, while in Las Vegas, Nevada, Brennan cashed in approximately $500,000 in casino gaming chips at the Mirage hotel. Then, in October of 1995, he directed Bond to cash in the bearer bonds. The proceeds from the sale of these bonds were later invested in various entities at Brennan's direction.

As a debtor in possession,[1] Brennan had an obligation to file monthly operating reports with the Bankruptcy Court. He failed to disclose the transactions involving the bearer bonds, as well as the casino chips and the cash received in

---

1. In a Chapter 11 bankruptcy, unless a trustee is appointed, the debtor is a "debtor in possession" and has the same powers and duties as a trustee. *See* 11 U.S.C. §1107(a).

exchange for his casino chips, in reports filed for the months of August, 1995 through June, 1997. Nor did he list these assets in any of the three amended schedules he filed between August and September of 1995.

On July 19, 2000, Brennan was indicted on charges that he concealed from the Bankruptcy Court the approximately $500,000 in casino gaming chips and the cash received in exchange for those gaming chips. The Government brought a first superceding indictment on November 1, 2000, which contained additional counts of bankruptcy fraud charging the concealment of the approximately $4 million in bearer bonds, together with charges of money laundering. A second superceding indictment was filed on December 20, 2000 and a third superceding indictment, containing thirteen counts, was filed on January 24, 2001. Brennan's bankruptcy proceeding was still ongoing at the time this last indictment was filed.

On April 16, 2001, a jury convicted Brennan of seven of the thirteen counts. *United States v. Brennan*, Crim. No. 00-490 (D.N.J. April 16, 2001). The jury found Brennan guilty of four counts of illegally laundering the proceeds of bearer bonds that he owned, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), two counts of bankruptcy fraud for his failure to declare the bearer bonds in his bankruptcy proceeding, in violation of 18 U.S.C. § 152(1) and (3), and one count of bankruptcy fraud for his failure to include the $500,000 in cash he received for the casino chips in his September financial report, in violation of 18 U.S.C. § 152(3).

Brennan filed a motion for a new trial under Fed. R. Crim. P. 33, which the District Court denied on June 22, 2001. On July 26, 2001, the District Court sentenced Brennan to 110 months imprisonment and a five year term of supervised release. Judgment was entered on July 31, 2001.

On appeal, Brennan asserts that the convictions should be reversed because: (1) there was prosecutorial misconduct during closing arguments; (2) the weight of the evidence failed to support his convictions; and (3) there was a coercive supplemental charge following a report by the

jury that it was deadlocked. In addition, Brennan contends that the District Court made three sentencing errors: (1) in calculating the amount of the loss; (2) in applying the fraud enhancement in U.S. Sentencing Guidelines Manual § 2F1.1(b)(4)(B) (Nov. 2000); and (3) in assessing a two-point enhancement for obstruction of justice pursuant to U.S. Sentencing Guidelines Manual § 3C1.1.

III. *Jurisdiction*

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

IV. *Prosecutorial Misconduct in the Closing Statement*

Brennan asserts that the prosecution made several improper and prejudicial comments in its closing and that it vouched for the credibility of its key witness, Peter Bond. Brennan also contends that the prosecutor improperly argued that Brennan had an obligation to produce evidence and commented on Brennan's failure to testify.

We review the District Court's ruling on any contemporaneous objections for abuse of discretion. *See United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001), *cert. denied*, 535 U.S. 944 (2002). A finding of prosecutorial misconduct requires reversal unless the error is harmless. *See* Fed. R. Crim. P. 52(a); *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc). Any non-contemporaneous objections are subject to plain error review.[2] *See* Fed. R. Crim. P. 52(b); *United States v. Olano*,

---

2. Federal Rule of Criminal Procedure 52(b) provides that "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Fed. R. Crim. P. 52(b). Accordingly, there must be an "error" which is "plain" and that "affects substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993). "Affecting substantial rights" means that the error must have been prejudicial to the defendant and have affected the outcome of the district court proceeding. *Id.* at 734. The decision to correct the forfeited error is "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Id.* (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).

507 U.S. 725, 731-32 (1993). "In order to demonstrate prosecutorial misconduct under a plain error standard, the review must reveal 'egregious error or a manifest miscarriage of justice.'" *Brown*, 254 F.3d at 458 (quoting *United States v. Price*, 76 F.3d 526, 530 (3d Cir. 1996)).

A.   *Vouching*

In *United States v. Young*, 470 U.S. 1, 11 (1985), the Supreme Court reiterated that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." The Court explained:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*Id.* at 18-19 (citing *Berger v. United States*, 295 U.S. 78, 88-89 (1935)). In *United States v. Walker*, 155 F.3d 180 (3d Cir. 1998), we extensively reviewed our caselaw regarding vouching, observing that

> two criteria must be met [to find vouching]: (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record. . . . The defendant must be able to identify as the basis for [the prosecutor's comment on witness credibility] explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record.

*Id.* at 187.

The *Walker* panel declared that a "prosecutor is engaging in proper argument and is not vouching" when he argues that "a witness is being truthful based on the testimony given at trial, and does not assure the jury [of] the credibility of the witness based on his own personal knowledge[.]" *Id.* Nor is it improper, according to *Walker*, for a prosecutor to comment on the "lack of evidence in the record" to support a "defendant's argument that the witness is not credible . . . so long as the comment does not constitute an assurance by the prosecutor that the witness is credible." *Id.* In other words, a "prosecutor may argue in the negative that the assertions made by defense counsel that a witness is lying are not supported by the testimony in the record." *Id.*

Since our decision in *Walker*, we have had several opportunities to revisit the vouching issue. In almost every instance, we have held that the district court did not err in denying a mistrial. *See United States v. Milan*, 304 F.3d 273, 289-90 (3d Cir. 2002); *United States v. Nelson*, 284 F.3d 472, 476 n.3 (3d Cir. 2002); *United States v. Saada*, 212 F.3d 210, 225 (3d Cir. 2000); *United States v. Helbling*, 209 F.3d 226, 240-41 (3d Cir. 2000) (holding that any vouching by prosecutor was harmless error because the judge informed the jury not to consider the relevant comments, there was a great deal of evidence to support the conviction and defendant was not prejudiced); *cf. Lam v. Kelchner*, 304 F.3d 256, 271-72 (3d Cir. 2002) (vouching did not so infect the trial with unfairness as to constitute a violation of due process as is required on habeas review); *Marshall v. Hendricks*, 307 F.3d 36, 65, 70 (3d Cir. 2002) (same); *Hartey v. Vaughn*, 186 F.3d 367, 372-73 (3d Cir. 1999) (on habeas review, concluding that Pennsylvania Superior Court did not act unreasonably in finding that there had been no improper vouching).

In *Milan*, the defendant alleged for the first time on appeal that the prosecutor engaged in improper vouching by eliciting testimony on the district court's role in approving wiretaps, the truthfulness of cooperating witnesses, and the prosecution of Government witnesses before they decided to cooperate. *Milan*, 304 F.3d at 289-

90. We held that there was no plain error because the prosecutor was not offering his personal opinion based on facts not before the jury. *Id.*

Similarly, in *Saada*, the defendant alleged for the first time on appeal that the prosecution improperly vouched for the credibility of its two informant witnesses by suggesting in closing argument that the two would be entitled to a reduced sentence in exchange for their cooperation only if they were truthful, and that they had numerous other crimes on which to cooperate and no motive to falsely implicate the defendant. *Saada*, 212 F.3d at 225. Noting that there was evidence introduced at trial that cooperation agreements were in place requiring the witnesses to testify truthfully, and also evidence that they had spent thousands of hours cooperating with the Government on other matters, we held that there was no plain error since the prosecutor was not referring to evidence outside the record. *Id.*

After *Walker*, the only case in which we found improper vouching requiring a mistrial was *United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275 (3d Cir. 1999). During the closing argument in *Dispoz-O-Plastics*, the prosecutor stated, "[the Government witnesses] told the Government they fixed prices twice and I can guarantee you the Justice Department doesn't give two for one deals; they had to plead guilty to both price-fixing conspiracies and their sentence reflected that." 172 F.3d at 283. We concluded that this statement was improper vouching because it was intended to convey to the jury that the prosecutor knew the witnesses were telling the truth when they testified about the conspiracies. *Id.* Moreover, we held that the statement did not constitute harmless error because the testimony from the witnesses was essential to the Government's case, the other evidence against the defendant was not overwhelming, and the judge failed to instruct the jury that the prosecutor's statement could not be considered as evidence. *Id.* at 286-87.

Here, Brennan contends that the prosecutor vouched for Bond's credibility. To be sure, Peter Bond's credibility was hotly contested and vigorously challenged by the defense. In summation, the prosecutor discussed Bond's credibility

at length by pointing out that he was examined for approximately five days on the witness stand and by asserting that Bond "stood by what he had originally told you. He never waivered [sic]. He never flagged. You had a chance to look him in the eye. . . And it comes down to credibility, you have to make the judgment." The prosecutor then reviewed Bond's agreement to cooperate with the Government and addressed the defense's contention that Bond was not believable. In particular, the prosecution referred to a defense attack on Bond's credibility which accused him of laundering money for Russian criminals. The prosecutor sought to meet this challenge by arguing:

> Where's the proof? Where's the evidence? You're going to have a whole lot of documents that were shown to Mr. Bond. Take as long as you need. Pass them around. Read them from top to bottom, backwards to forwards. And if anybody can find anything that indicates Mr. Bond was laundering money for Russian criminal interests, by all means disregard his testimony. The FBI has conducted an investigation of this matter since 1998. The FBI. And as Special Agent Sica told you, there's no evidence that Mr. Bond laundered money for anybody in Russia or anywhere else.

The prosecutor also disputed the defense's contention that Bond was arms dealing with Russians and embezzling Brennan's money. After praising the jury system, the prosecutor then stated:

> But one very prominent feature that [sic] about this system, one — one hallmark of our system is that we don't make accusations without proof. Even if it's against a man who lives in another country. And that's what's happened here.

> Peter is not lying to you. You have the proof in the form of corroboration. You have the proof in the form through looking at him for five days and watching him testify. He's not a Russian money launderer. He's not a Russian arms dealer. He's not a thief. Those are accusations and accusations without proof are unacceptable and you can't accept them.

On rebuttal, a second prosecutor told the jury that the evidence demonstrated that Bond committed crimes with Brennan, not that Bond was dealing arms. Again, attempting to blunt the impact of the defense's attack on Bond's credibility, the prosecutor declared:

> Evidently, . . . judgment was made that it was more important to obtain Mr. Bond's cooperation than to prosecute Mr. Bond. He was somebody . . . in the business of hiding money, and fell into this relationship with Mr. Brennan. That's what this is about. But that's not what you hear. What you hear is that this is about Russian money laundering. There's no evidence to that.

Brennan takes issue with several comments made by the prosecutors to the jury: (1) the reference to the FBI's investigation of Bond with respect to Russian money laundering; (2) the statement that "one hallmark of our system is that we don't make accusations without proof"; and (3) the assertion in rebuttal that the Government made the judgment that it was "more important" to obtain Bond's cooperation than to prosecute him. In Brennan's view, the assertion that the Government does not make accusations without proof indicates that "there has been a predetermination of [Brennan's] guilt." Referring to the FBI's investigation, Brennan submits, amounted to improper vouching for Bond's credibility since it suggested to the jury the prosecutor's belief that Bond was not involved in such criminal activity. In short, Brennan contends that these statements pointed to evidence outside of the record, namely the FBI's investigation and conclusion that Bond was not involved in Russian money laundering.

In determining whether these remarks warrant reversal, it is important to note that the defense objected during a break in the summation to the Government's statement that it does not "make accusations without proof." Thus, any potential prosecutorial misconduct related to this statement is reviewed for harmless error under Fed. R. Crim. P. 52(a). *See, e.g.*, *Zehrbach*, 47 F.3d at 1265.

The defense also objected to the argument about the absence of proof of money laundering, but on different

grounds than those now raised on appeal. At trial, the defense objected because the Government had prevented the admission of documents which the defense claimed demonstrated Bond's involvement in money laundering and arms dealing. Those documents showed Bond's company sending money to a company listed in his cooperation agreement and contemplating membership in a defense manufacturers association. Bond was cross-examined about these documents when he testified, but the District Court did not allow them to be admitted at that time. Later, however, following a defense objection during summation, the District Court allowed the defense to reopen its case and admitted into evidence the previously excluded documents.

Although the defense objected to the exclusion of these documents, no objection was made that the argument about absence of proof and the FBI investigation vouched for Bond's credibility. Brennan contends that he objected during the trial to any expression by Special Agent Sica of his opinion about Bond's character for truthfulness. Agent Sica's testimony regarding the results of the FBI's investigation into money laundering, however, does not relate to Bond's truthfulness. For that reason, we review the challenge to this portion of the summation for plain error under Fed. R. Crim. P. 52(b). *See Olano*, 507 U.S. at 731-32. We likewise review for plain error the prosecutor's speculation regarding the comparative importance of securing Bond's cooperation rather than prosecuting him because the defense first objected to that statement in its motion for a new trial.

In determining whether these statements to the jury improperly vouched for Bond's credibility, we must consider them in context. *See Young*, 470 U.S. at 11-12. We believe that the prosecutor's initial rhetorical question regarding any proof of Russian money laundering and his comment regarding Sica's testimony constituted appropriate argument that merely reviewed the evidence admitted at trial. That evidence included Sica's testimony that the FBI did not uncover evidence that Bond was involved in Russian money laundering. As we recognized in *Walker*, a "prosecutor may argue in the negative that the assertions

made by defense counsel that a witness is lying are not supported by the testimony in the record." 155 F.3d at 187. To preclude a prosecutor from making such an argument would deny him use of a legitimate tool of effective advocacy.

The assertion that the Government does not make accusations without proof is, at first blush, more problematic because it could be read to suggest that evidence outside the record demonstrated Brennan's guilt. Read in isolation, this statement is not unlike the comment in *Dispoz-O-Plastics* that the government does not give "two for one deals." 172 F.3d at 283. However, immediately following his assertion that the Government does not make accusations without proof, the prosecutor directed the jury to consider the corroborating evidence and Bond's demeanor during his five days of testimony. This assertion was made in the midst of the prosecutor's discussion of Brennan's accusations against Bond and his argument that there was no evidence to support such accusations. This was also permissible argument under *Walker*. 155 F.3d at 187.

Significantly, when read in context, neither of these brief statements made during summation suggest that the prosecutor had personal knowledge or possessed other information not contained in the record that would have supported Bond's credibility. Neither statement occasioned error. Both statements were intended to call the jury's attention to the absence of any evidence to support the defense's accusations against Bond. In both instances, the prosecutor immediately followed his statements with instructions to the jury to examine the evidence of record. Indeed, the FBI's investigation of Bond for his involvement in money laundering, the results of that investigation, and his eventual agreement to cooperate with the Government were all matters of record testified to by Special Agent Sica.

Finally, while Brennan may take issue with the statement that "judgment was made" that Bond's cooperation was more important than his prosecution, considering the context, we can find no error, let alone plain error. That statement related to the evidence of record which showed that Bond's testimony was gained by virtue of an agreement

and that the Government's star witness had his own credibility problems. Indeed the making of such "judgments" — routine exercises of prosecutorial discretion — commonly form the basis of defense attacks upon the prosecution when an uncharged accomplice cooperates by providing testimony. Since it was obvious to the jury that the Government had charged Brennan, and since they learned from the testimony that the Government had not charged Bond, the prosecutor's remark conveyed to the jurors no more than they already knew. *See Saada*, 21 F.3d at 225 (holding that prosecutor's reference to cooperation agreements with Government witnesses was not plain error); *Milan*, 304 F.3d at 289-90 (holding that it was not improper for prosecutor to refer to testimony about prosecution of Government witnesses before they decided to cooperate).

Accordingly, we conclude that none of the challenged remarks constitute improper vouching.

B. *Comment on Brennan's Failure to Testify*

In *Griffin v. State of California*, the Supreme Court held "that the Fifth Amendment, in its direct application to the Federal Government . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." 380 U.S. 609, 615 (1965). A remark is directed to a defendant's silence when " 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *Bontempo v. Fenton*, 692 F.2d 954, 959 (3d Cir. 1982) (quoting *United States v. Chaney*, 446 F.2d 571, 576 (3d Cir. 1971)). Statements regarding the "absence of facts in the record[,]" however, "need not be taken as comment on [a] defendant's failure to testify." *Bontempo*, 692 F.2d at 959 (citing *Braxton v. Estelle*, 641 F.2d 392, 397 (5th Cir. 1981)); *see also Brown*, 254 F.3d at 462-63 (statements by prosecutor in summation did not impermissibly comment on defendant's silence or shift burden of proof to the defense); *United States v. Isaac*, 134 F.3d 199, 206-07 (3d Cir. 1998) (prosecutor did not violate 5th amendment by stating in his closing argument that "[the defendant] captained that boat from Jamaica, and the

only people who would know that [the defendant] captained that boat from Jamaica are [the defendant], Conrad Brown, Irvin Reid, and that fourth individual in Jamaica. Those are the only people").

In the instant case, Brennan argues that the prosecution improperly commented on his failure to testify and suggested to the jury that he had the burden to produce evidence. He points to the following remarks by the prosecution on rebuttal regarding the transfer of the bearer bonds:

> The next thing that happened is in June, 1995 Mr. Bond says, Mr. Brennan gave him $4 million thereabouts in bearer bonds. We agree there's no direct evidence of this, except Mr. Bond's testimony. There was nobody else there except Mr. Brennan and Mr. Gaito [Brennan's accountant]. There's also no evidence that this didn't happen. Mr. Critchley [defense counsel] spent a lot of time on this. On the plane record, the telephone record, credit card record. None of it proves anything. It's — it is an argument that Mr. Bond changed the date from June 5 to June 10th. Somehow this is supposed to show that Mr. Bond is lying about the whole thing. This is more a power of suggestion. If you hear it often enough that it — you know, it's changed from June 5th to June 10th indicates that he's lying, maybe you'll believe it. But there's no indication that it means anything. The evidence is that he always said he never knew exactly what the date was. What he knew is that it happened when he was taking a trip with his family to Disneyland . . . That's what he always said. He was here in late May, early June. He didn't know exactly when during that trip this occurred. What's clear is that he was in the United States during that period. What's also clear is that he was at Due Process Farm. He described it to you in detail. You didn't hear that description challenged by the defense. Why? Because it was very, very accurate.

In addition, Brennan challenges the rhetorical questions of the prosecutor in his initial closing which asked where the proof was that Bond had engaged in money laundering, arms dealing, or embezzlement. He also contends that the

prosecution improperly compared the number of witnesses and exhibits put forth by the prosecution and defense, thereby "direct[ing] the jury to consider why Brennan had not testified." Moreover, Brennan asserts that the prosecution shifted the burden by commenting that the three defense witnesses "knew nothing about the case" and then asked the jury to "think about the defense witnesses, and just reflect upon the fact that after four weeks of trial, they called no one who knows anything about the case." Brennan concedes in his brief that he did not object to the remarks that he claims shifted the burden of proof, and that the issue was first raised when he filed his motion for a new trial. Thus, in the absence of an objection at trial, we must review for the presence of plain error. *See Olano*, 507 U.S. at 731-32.

With respect to the prosecution's remarks during rebuttal concerning the transfer of the bearer bonds, nothing in the remarks suggested that the jury should consider the fact that Brennan failed to testify. Viewed in context, the statements concerned Bond's credibility and the fact that the record lacked evidence contradicting his testimony concerning the point in time he claimed to have received the bonds from Brennan. This was permissible argument regarding what evidence was, and was not, in the record.

We declared *supra* that the rhetorical question concerning any proof of record that Bond engaged in money laundering was not improper vouching. Likewise, comment on the absence of evidence on this issue did not impermissibly direct the jury to consider Brennan's election not to testify.

Nor were the prosecution's remarks about the defense's failure to call anyone who knew anything about the case a comment on Brennan's failure to testify. The context of this statement reveals that it was directed toward the weight the jury should accord to the testimony of the three defense witnesses. At the conclusion of the prosecutor's review of the testimony of these witnesses, he emphasized that the jury must honor the presumption of innocence and "hold us to the burden of proof and you must be convinced of Mr. Brennan's guilt, beyond a reasonable doubt." Under these circumstances, this remark did not constitute an

impermissible reference to Brennan's failure to take the witness stand. *See United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996) (observing that prosecutor's comment, which focused on pointing out to the jury the holes in the defense's theory, was permissible argument).

In sum, nothing in either the Government's summation or rebuttal was improper argument. There was, therefore, no error.

V.  *The Weight of the Evidence*

This Circuit has described a district court's consideration of a Fed. R. Crim. P. 33 motion for a new trial based on the "weight of the evidence" as follows:

> A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it "believes that 'there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quoting *United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990)). Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case. *See United States v. Lacey*, 219 F.3d 779, 783-84 (8th Cir. 2000); *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988).

*United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Thus, "[m]otions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." *Government of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted). We review the denial of a Rule 33 motion for abuse of discretion. *See United States v. Jasin*, 280 F.3d 355, 360 (3d Cir. 2002).

Here, appellant argues that the guilty verdicts on six of the seven bankruptcy fraud and money laundering counts were against the weight of the evidence due to inconsistencies in Bond's testimony about the transfer of the bearer bonds.[3] While the Government was investigating

_____

3. The exception is Count 7, which charged Brennan with failing to disclose to the Bankruptcy Court his receipt of $525,594 from the

its case against Brennan, Bond provided investigators with a credit card receipt for airfare from Orlando, Florida, dated June 5, 1995. Based on this credit card voucher, the Government proceeded on a theory that, on June 5, 1995, Bond flew to New York, then traveled to New Jersey, to meet with Brennan. There, the Government theorized Bond took possession of the bearer bonds from Brennan, whose use and concealment formed the basis of most of the counts on which Brennan was convicted.

Shortly before trial, the Government obtained a copy of the actual airline ticket associated with this credit card voucher. As it turned out, the ticket was for a morning flight to Washington, D.C., with a return flight to Orlando occurring the afternoon of June 5. No documentary evidence of Bond's taking a flight to New York on any other date was ever uncovered.

At trial, Bond testified that, on the return leg of his holiday, he traveled to New York to meet with Brennan before flying home. He testified that he could not recall the exact date of this travel, but "believed it was the 10th of June," not June 5. Confronting Bond on cross-examination, defense counsel pursued Bond about the credit card voucher, the discovered ticket, and the travel it indicated he took to Washington, D.C., not New York. Bond *denied* that he ever told the FBI that the date of the meeting was June 5; rather, he could not remember the exact date, but stated that he saw Brennan "towards the end of that holiday. We hadn't tied down a date." Bond testified that he had "always said" the day of the meeting was the day he left Florida. The prosecution then established the likely date of this meeting to be June 10, 1995, by the credit card receipt that indicated Bond checked out of his Disneyworld hotel that day.

Brennan now argues that "the weight of the evidence did not support a finding that the alleged June 1995 transfer [of bearer bonds] occurred." Brennan describes the "bond transfer in June 1995 as the predicate unlawful activity"

Mirage hotel casino in September 1995. All of the other convicted counts involved the bearer bonds.

that all the money laundering convictions stem from; therefore, according to the defense, it was necessary for the Government to prove this particular event beyond a reasonable doubt. Through this argument, Brennan is attempting to make the evidence regarding the transfer of the bearer bonds to Bond in June of 1995 critical to proving the elements of the offense. It is not. Liability for money laundering is imposed on:

> Whoever, [1] knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, [2] conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . [3] (B) knowing that the transaction is designed in whole or in part— (i) to conceal or disguise the . . . ownership, or the control of the proceeds of specified unlawful activity . . . .

18 U.S.C. §§ 1956(a)(1)(B)(i).

The actual transfer of the bearer bonds to Bond on June 5/10 was not itself a financial transaction to conceal or disguise the ownership or control of the proceeds of an unlawful activity. Rather, the Government's theory was that the offending transactions took place later when, at Brennan's direction, Bond cashed the bonds and invested the proceeds. Brennan seems to suggest that, unless the Government proved that Brennan passed the municipal bonds to Bond on June 10, the Government cannot be said to have linked the money Bond later invested to Brennan, and thereby failed to prove "the property involved in [the subsequent] financial transaction[s] represent[ed] the proceeds of some form of unlawful activity;" specifically, that the proceeds laundered were undeclared "property belonging to the estate of a debtor [Brennan]." *See* 18 U.S.C. §§ 1956(a)(1)(B)(i), 152(1). We do not agree.

Logically, proof of the existence of *any* bearer bonds or proceeds *after* Brennan declared bankruptcy on August 7, 1995 would be circumstantial evidence that those bonds existed and belonged to Brennan *prior* to the declaration, provided there is no explanation for how those bonds and proceeds came into Brennan's possession once he had filed

for bankruptcy. Our review of the record revealed that such evidence existed. This evidence included the fact that the bearer bonds in question were redeemed through Bond's company, Valmet; the proceeds were invested in companies with connections to Brennan; the profits from those investments were again invested into yet other entities with connections to Brennan; and Brennan's personal accountant was communicating with Valmet and directing other transactions that produced benefits for Brennan. There was evidence that proceeds from these transactions were returned to Brennan in various ways. Furthermore, Brennan's income tax returns showed significant municipal bond income in years 1993 and 1994, but no such income appeared in taxable year 1995. We agree with the District Court that all of "these facts are nearly impossible to explain unless Bond's testimony was truthful." Thus, even if there was *no* testimony of *any* witness as to when Bond acquired the bearer bonds from Brennan, it still appears that Brennan could have been convicted of the money laundering counts based on this other circumstantial evidence.

Assuming, *arguendo*, defense counsel's premise that proving the transfer of June 1995 was of predicate significance, the jury was reasonable in concluding that the transfer actually occurred. Brennan describes Bond's testimony as "simply unbelievable," but that determination was, first and foremost, one for the jury. *See Derricks*, 810 F.2d at 55. While the June 5 airline ticket to Washington, D.C. may contradict any notion that the transfer occurred on *that* date, and while the "Used" stamp is confusing considering Bond's testimony that he only recalled interrupting his vacation one time, the mere existence of that ticket does not disprove that Bond traveled to New Jersey on June 10, 1995.

On cross-examination, Brennan's counsel questioned Bond extensively on this subject, and the transcript reveals considerable testimony that helps explain the events of that period, testimony that the jury must have found credible. While Bond admitted to purchasing an airline ticket on June 5th, he denied that he used an airline ticket that day. He stated that he did not "believe" he traveled to

Washington on June 5th. As defense counsel persisted, the following cross-examination took place:

A   When I got the other ticket, it jogged my memories to the circumstances I believed happened.

Q   When you got the other ticket, you mean the ticket — the ticket [from June 5] that said ["Used"] when you got [it] that February 26th.

A   That jogged my memories that — chronology of the events. Yes.

Q   So this June 10th date — this June 10th date, the first time you decided to go with this version was after February 26th, 2001. Isn't that a fact?

A   No, because I never said a date. I'd always actually said it was towards the end of my holiday. In fact — and my testimony on several times said I left the Florida — left the airport — left my wife at the airport in Orlando. She came home, and I traveled up. That tagged the date to the end of my holiday. The fact that the ticket turned up with an earlier date was confusing to me at that time. It would always be in my mind, and I believe I testified to the effect that, I believed it to be at the end of my holiday which is always around the tenth.

The defense succeeded in showing that an airline ticket was purchased to Washington, D.C. on June 5. Bond conceded that he also could not explain that ticket. However, Bond "always" stated that he traveled to New Jersey "towards the end of my holiday," not on any particular date. From Bond's credit card statement, one could reasonably conclude that he traveled to New Jersey after checking out of his Florida hotel, on June 10. Regardless, our review of all of the other evidence of Brennan's guilt indicates that there is not a "serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Johnson*, 302 F.3d at 150. Therefore, the District Court did not abuse its discretion in refusing to grant a new trial on the basis of the weight of evidence.

## VI.   *Coerced Verdict Based on Improper Jury Instruction*

After five days of deliberation, the jurors informed the District Judge that they were deadlocked. In response to their note, the Court gave a supplemental jury charge pointing out the importance of the case to both parties and the desirability of a verdict. The District Court also noted that the jury had "deliberated for only five days."[4] Following

---

4. The exact charge was as follows:

All right. Now, in regard to that, as I told you in my original instructions, this case is an important one to the Government. It is equally important to the defendant. It is desirable if a verdict can be reached but your verdict must reflect the consent, conscientious judgment of each juror. Under no circumstances must any juror yield his conscientious judgment.

You have deliberated for only five days in a case that previously took 19 days to try. It is normal for jurors to have differences. This is quite common. Frequently, jurors, after extended discussions may find that a point of view, which originally represented a fair and considered judgment, might well yield on the basis of argument and upon the facts in the evidence.

However, and I emphasize this, no juror must vote for any verdict unless after full discussion or consideration of the issues in exchange of views it does represent his or her considered judgment.

Further consideration may indicate that a change in original attitude is fully justified upon the law and all of the facts. I do want to read to you a statement contained in the Supreme Court Opinion which is well-known to the bench and Bar and it is this. "That although a verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusion of his or her fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinion of each other, that is with their duty to decide the case if they could conscientiously do so.

You're reminded also that the Prosecution bears the burden of proving each element of the offense beyond a reasonable doubt. Do not ever change your mind just because the other jurors see something different or just to get the case over with. As I've told you before, in the end your vote must be exactly that, your vote. And important as it is for you to reach a unanimous agreement, it is just as important that you do so honestly and in good conscience."

With that instruction, I will return you to the jury room. Thank you.

the charge, the jury deliberated for two more days and then returned a verdict. Appellant contends that the supplemental jury charge was unduly coercive because it gave the jurors the impression that deliberations could last indefinitely. We must review the instructions to a jury not " 'in artificial isolation, but . . . in the context of the overall charge.' " *United States v. Park*, 421 U.S. 658, 674 (1975) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)). Since Brennan failed to object to the supplemental charge we review only for plain error. *See United States v. Eastern Medical Billing, Inc.*, 230 F.3d 600, 610 (3d Cir. 2000).

The leading case addressing allegations of a coercive supplemental jury charge is well known. In *Allen v. United States*, 164 U.S. 492 (1896), the Supreme Court upheld a supplemental jury charge which recommended that the jurors with views in the minority consider whether their views might be erroneous. Nonetheless, in 1969, this Circuit developed a prophylactic rule prohibiting the use of such an *Allen* charge because of its power to coerce. *See United States v. Fioravanti*, 412 F.2d 407 (3d Cir. 1969); *see also Eastern Medical Billing, Inc.*, 230 F.3d at 613-15 (holding that *Allen* charge given by court was coercive and required a new trial). We suggested, however, that a charge would not be coercive if it contained language urging the jurors to re-examine their own view but not to "surrender [their] honest conviction as to the weight or effect of evidence solely because of the opinion of [their] fellow jurors, or for the mere purpose of returning a verdict." *Fioravanti*, 412 F.2d at 420 n.32; *see also United States v. Alper*, 449 F.2d 1223, 1234 (3d Cir. 1971) (holding that a supplemental jury charge was not unduly coercive because although it suggested jurors re-examine their views, it told them not to surrender their honest convictions); *cf. also Gov't of the Virgin Islands v. Gereau*, 502 F.2d 914, 935-36 (3d Cir. 1974) (holding that a statement that the jurors were not required to reach a verdict but should try to do so was not coercive).

Although the Supreme Court held in *Allen* that the "minority" jury charge was not coercive, it subsequently declared that where the district court told a deadlocked jury in a supplemental charge: "[y]ou have got to reach a

decision in this case," this was unduly coercive and warranted a new trial. *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam). Similarly, in *United States v. Burley*, 460 F.2d 998, 999 (3d Cir. 1972), this Court held that where a district judge instructed a deadlocked jury to consider the burdens and expense to the government of a new trial, this too was unduly coercive.

In addition to the "minority" jury charge, the charge mandating a decision, and the charge stressing the expense of a new trial, this Circuit has also addressed the coerciveness of potentially lengthy deliberations. In *United States v. Graham*, 758 F.2d 879 (3d Cir. 1985), we considered whether the district court's failure to respond to a juror's request to be excused for Yom Kippur was coercive. We noted that a judge's actions "in requiring further deliberation after the jury has reported a disagreement does not, without more, constitute coercion." *Id.* at 884 (quotation omitted). In addition, we held that the imminent onset of Yom Kippur was not coercive in itself, and defendant failed to introduce any evidence that the jurors were in fact coerced to agree upon a verdict because of the impending holiday. *Id.* at 885. We stated that:

> While some courts have found the length of time that the jury was made to deliberate, to be coercive, . . . these cases have involved *affirmative* coercive conduct of the district court, such as reminding the jury that the weekend was approaching . . . or creating the impression that the jury would be locked up all night.

*Id.*

Reviewing in its entirety the supplemental charge given by the District Court to the jury, we do not believe that it even came close to being coercive. The Court's charge did express a belief to the jury that it had not deliberated for a sufficient period of time, but this was not affirmative coercive conduct akin to that described in *Graham*. In addition, while the Court emphasized the desirability of a verdict, this instruction was tempered by the caution that "[u]nder no circumstances must any juror yield his conscientious judgment." The Court also warned the jurors: "[d]o not ever change your mind just because the other

jurors see something different or just to get the case over with." Perhaps most importantly, the Court reminded the jury: "As important as it is for you to reach a unanimous agreement it is just as important that you do so honestly and in good conscience." Just as in *Alper*, these warnings and reminders removed any possibility that the supplemental charge could be considered as coercive. Moreover, the District Court did not suggest that the jury was required to reach a verdict, nor did it emphasize the burdens or costs of a new trial. Accordingly, the District Judge's supplemental charge to the jury was not error, plain or otherwise.

VII. *Loss under U.S. Sentencing Guidelines Manual § 2F1.1*

Appellant was convicted for, *inter alia*, concealing bearer bonds with a face value of $3,795,000.00 from the bankruptcy estate; however, the District Court imposed its sentence based on an estimated loss to the bankruptcy estate of $22 million. As a debtor in possession, Brennan was obligated to file monthly operating reports with the Bankruptcy Court from the time he declared bankruptcy in August 1995 until June of 1997, when the Bankruptcy Court appointed a trustee to take possession of the bankruptcy estate. However, in October of 1995, Brennan had ordered the bearer bonds cashed and the bonds' proceeds otherwise invested. By June of 1997, when Brennan ceased to be a debtor in possession, those investments had netted an additional $18 million in profits, none of which Brennan reported. The Bankruptcy Code, 11 U.S.C. § 541(a)(6) provides that "proceeds, products, offspring, or profits of or from, property of the estate" are included in the bankruptcy estate. The District Court therefore reasoned that because bankruptcy law considers investment profits from estate funds part of the bankruptcy estate, the $18 million in profits should also have been reported. The District Court added those profits to the base $4 million value of the bonds to determine the loss under the Sentencing Guidelines. This analysis resulted in a 16 level enhancement pursuant to U.S. Sentencing Guidelines Manual § 2F1.1(b)(1)(Q) (2000) for a loss greater than $20 million, rather than the 13 level enhancement that would have applied to a loss of less than $5 million under § 2F1.1(b)(1)(N).

We exercise plenary review over a district court's conclusion of what constitutes loss under the Sentencing Guidelines, *see United States v. Maurello*, 76 F.3d 1304, 1308 (3d Cir. 1996), but we must accept the District Court's factual finding as to the amount of loss unless it is clearly erroneous. *See, e.g., United States v. Cherry*, 10 F.3d 1003, 1009 (3d Cir. 1993) (clearly erroneous standard applies to findings of fact).

Brennan argues that under the Sentencing Guidelines, the profits from the bonds should not be included in the amount of loss, and alternatively, that the $18 million loss figure was not properly found by the District Court, nor supported by the evidence.

A. *Whether the $18 Million in Profits Were Part of the Loss*

Brennan contends that under U.S. Sentencing Guidelines Manual § 2F1.1, Note 8 (2000), a loss "does not . . . include interest the victim could have earned on [money, property, or services unlawfully taken] had the offense not occurred." Analogizing the $18 million in profits earned on the bond proceeds after redemption to earned interest, Brennan asserts that the District Court improperly counted those profits as loss to the bankruptcy estate. Brennan's argument fails because his concealment was a continuing offense. *See* 18 U.S.C. § 3284 ("concealment of assets of a debtor . . . shall be deemed to be a continuing offense . . ."). Thus, the actual loss includes the $18 million in profits because Brennan was obligated to declare those proceeds every month through June of 1997, not just in August of 1995.

Although we have not previously addressed the issue of the duration of a bankruptcy fraud for the purpose of setting loss under the Guidelines, other circuits have held that bankruptcy fraud is a continuing offense which lasts until it is detected or its consequences are purged. *See United States v. Stein*, 233 F.3d 6, 18-19 (1st Cir. 2000) ("concealment by its nature is an act which goes on until detected or its consequences are purged . . . [h]ence it was proper for the court to base its intended loss findings on the value of the property at the time of the sale," not at the

time of concealment); *cf. United States v. Butner*, 277 F.3d 481, 487-88 (4th Cir. 2002) (in bankruptcy concealment action, calculation of fraud loss should take into account relevant conduct under Guideline § 1B1.3 that occurred after defendant's initial bankruptcy filing where it was linked to the bankrupt estate); *United States v. Moody*, 923 F.2d 341, 351 (5th Cir. 1991) (noting that concealment of bankruptcy assets is a "continuing offense"). We concur with this approach.

As Brennan implicitly admits, the District Court correctly applied § 2F1.1 at sentencing. *See* 18 U.S.C. § 152 ("A person who . . . (1) knowingly and fraudulently conceals . . . ."). In interpreting that Guideline, this Circuit has acknowledged that "basing all fraud sentences on a simple 'amount taken' rule without regard to actual or intended harm would contravene [§ 2F1.1's] purpose." *United States v. Kopp*, 951 F.2d 521, 527 (3d Cir. 1991), *superceded on other grounds as recognized by U.S. v. Sharma*, 190 F.3d 220 (3d Cir. 1999). The "fraud guideline defines 'loss' primarily as the amount of money the victim has actually ended up losing at the time of sentencing, not what it could have lost"; therefore, "loss should [be] revised upward to the amount of loss that the defendant intended to inflict on the victim . . . if . . . estimatable and higher." *Id.* at 531.

Likewise, we conclude that limiting Brennan's sentence to the $4 million he concealed from the Bankruptcy Court in August of 1995 would be an overly simplistic application of the Guidelines. Due to the continuing nature of Brennan's offense, "the amount of loss that the defendant intended to inflict on the victim" was $22 million. *Id.* The bankruptcy estate was not only entitled to the bearer bonds, but all of their proceeds. 11 U.S.C. § 541(a)(6). Brennan's concealment was of this total amount, and not simply the value of the bearer bonds.

Even if these profits were not considered actual loss from the continuing fraud on the Bankruptcy Court, Brennan's concealment of them was at least uncharged relevant conduct the District Court was entitled to consider. Under U.S. Sentencing Guidelines Manual § 1B1.3(a) (2000), specific offense characteristics, such as the amount of loss, are "determined on the basis of . . . all acts . . . committed

. . . by the defendant . . . that occurred during commission of the offense of conviction" and "all harm that results from [such] acts." As Brennan's concealment of the $18 million profit occurred during the continued concealment of the bearer bonds, the District Court could also consider the profits' concealment in Brennan's sentencing.[5]

Either way, the profits were properly a part of the bankruptcy estate which were concealed from the Bankruptcy Court each time Brennan filed a monthly report to the Bankruptcy Court from August 1995 until June of 1997, when the total amount concealed from the bankruptcy trustee stood at $22 million. Because the concealment for which Brennan was formally indicted was still ongoing in 1997, and the original concealment of the bearer bonds had not yet been detected at that date, the further concealment of the $18 million in profits was either direct actual loss from the continuing offense or relevant uncharged conduct committed during the original offense. Therefore, those profits were properly considered in establishing the total loss.

B. *Whether the $18 Million Profits Were Properly Found by the Court*

Brennan argues that even if it is proper to consider the profits made as part of the bankruptcy fraud, the District Court did not make its own factual findings with respect to the profits, but merely adopted the facts in the pre-sentence investigation report, in violation of former Fed. R. Crim. P. 32 (c)(1) (2001) (now Fed. R. Crim. P. 32(i)(3)(B)). *See United States v. Evans,* 155 F.3d 245, 253 (3d Cir. 1998) (holding that the district court must make findings on the record as to the basis for its conclusion about the

_____

5. In addition, the District Court might have applied Section 1B1.3(a)(2), which includes as relevant conduct all acts that were part of the "same course of conduct or common scheme or plan" as the offense conduct if those acts would be grouped as multiple counts under U.S.S.G. § 3D1.2(d). Here, both offenses are bankruptcy fraud in which the offense level is based on total amount of loss, as required by Section 3D1.2(d). Therefore, if both the concealment of the bearer bonds and the concealment of the profits are part of the same course of conduct, the profits may be included in the loss calculation.

amount of actual loss); *Cherry*, 10 F.3d at 1013-14 (Fed. R. Crim. P. 32(c) requires that "where a defendant alleges any factual inaccuracy in the presentence report, the Court must make: (1) a finding as to the allegation, or (2) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing"); *see also United States v. Parrott*, 148 F.3d 629, 633 (6th Cir. 1998) (holding that former Fed. R. Crim. P. 32(c) prohibits a court faced with a disputed fact in the sentencing report from adopting it without making a factual finding of its own). While both Bond and David Donnelly, Valmet's accountant, testified to the amount of Brennan's profit, Brennan alleges that the District Court did not consider that Donnelly admitted to "cooking the books" and that Bond was unclear as to the actual amount of profit.

Despite Brennan's assertions, it appears that the District Court did not rely solely on the pre-sentence investigation report but rather made its own finding that the testimony of Donnelly and Bond was credible. The District Court stated:

> Brennan was required to report [the profits] and didn't do so. So the question is really whether Mr. Donnelly's estimation or other evidence supports the amount claimed in the presentence report.

> The Government asserts in its reply sentencing memorandum, that although Donnelly was cross examined on aspects as to the reliability of his records, he "never wavered from his insistence that the bottom line, total of his statements were accurate."

> And the 22 million dollar figure is supported by extensive other evidence. According to testimony by Bond, which was totally corroborated by documents, Bond paid out the following amounts from the pot of money, consisting of the proceeds of Brennan's bearer bonds plus the trading profits earned by investing those proceeds, at page 10 of the Government's brief.

> They go through an amount of the sum of 14 million dollars plus numerous smaller payments that they say corroborates this as being in excess of 20 million dollars, given the test under the guidelines, I find that

the position taken there is credible. That the defense has not rebutted the presentence report. And that the presentence report is credible, the amount in controversy will remain as set forth in the presentence report at paragraph — or objection number eight.

Taken out of context, the last two sentences could give the impression that the District Court was improperly relying on the presentence report to derive the amount of the profits. Properly read in context, it is clear that the Court weighed the testimony of Donnelly and Bond and found it credible with respect to the total amount of Brennan's profits. Accordingly, the District Court's finding that there was $18 million in profit was not clearly erroneous.

VIII. *Application of the November 2000 Guidelines Enhancement for Bankruptcy Fraud*

Brennan was first indicted on July 19, 2000 on charges that he concealed casino gaming chips and cash received in exchange for gaming chips from the Bankruptcy Court. The Government later filed a first superceding indictment on November 1, 2000, which alleged additional charges of bankruptcy fraud involving the concealment of bearer bonds, and money laundering. A second superceding indictment on December 20, 2000, added two money laundering counts. A third superceding indictment on January 24, 2001, made minor changes to the factual allegations. Since all the violations were alleged to have continued through the date that the last superceding indictment was filed, the District Court held that application of the new 2000 Sentencing Guidelines to Brennan's sentence did not implicate the *ex post facto* clause.

Brennan now argues that this application of the November 1, 2000, U.S. Sentencing Guidelines Manual violated the *ex post facto* clause because his bankruptcy fraud concluded prior to November 2000, when the first superceding indictment containing the bearer bond concealment charges was issued. We exercise plenary review over whether the District Court applied the correct version of the Sentencing Guidelines. *See United States v. Bertoli*, 40 F.3d 1384, 1403 (3d Cir. 1994).

The *ex post facto* clause is violated when a court applies a change in the law which is adverse to the interests of a defendant where that change occurred after the commission of the crime. *See* U.S. Const., art. I, § 9, cl. 3. Accordingly, when the court in a criminal case is confronted with post-offense amendments which call for a more severe sentence than that prescribed by the Guidelines in effect at the time of the offense, the court must apply the Guidelines as they existed at the time of the crime. *See* U.S. Sentencing Guidelines Manual § 1B1.11(b)(1) (2000); *United States v. Omoruyi*, 260 F.3d 291, 297 (3d Cir. 2001).

Prior to November 1, 2000, U.S. Sentencing Guidelines Manual § 2F1.1(b)(4)(B) (1999) provided for a two level increase in offense score if the offense involved a "violation of any judicial or administrative order, injunction, decree or process." In interpreting that version of § 2F1.1(b)(4)(B), we held that a bankruptcy proceeding was not a "judicial process" and that a bankruptcy rule did not constitute a "judicial order." *See United States v. Thayer,* 201 F.3d 214, 226-28 (3d Cir. 1999). However, on November 1, 2000, Section 2F1.1(b)(4)(B) was changed to include a two-point enhancement if the offense involved "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding." U.S. Sentencing Guidelines Manual § 2F1.1(b)(4)(B) (2000). Thus, the District Court's application of the 2000 Guidelines Manual resulted in a harsher sentence for Brennan than that called for by earlier versions of the Manual, potentially implicating the *ex post facto* clause.

Nonetheless, when an amendment is a mere clarification, rather than a substantive change to the Guidelines, its application does not violate the *ex post facto* clause. *See Bertoli*, 40 F.3d at 1405. The Government argues that because Amendment 597 to U.S. Sentencing Guidelines Manual § 2F1.1(b)(4)(B) resolved a Circuit split on whether the "judicial process" included a bankruptcy proceeding, it was a clarifying amendment. However, where an amendment overrules a prior judicial construction of the guideline it is substantive. *See Bertoli*, 40 F.3d at 1405; *United States v. Diaz*, 245 F.3d 294, 303 (3d Cir. 2001). Because this Circuit has previously held that "judicial

process" did not include bankruptcy proceedings, *see Thayer,* 201 F.3d at 226-28, Brennan argues the change rendered by Amendment 597 is substantive. *Cf. also United States v. Butner,* 277 F.3d 481, 489 (4th Cir. 2002) (holding that Amendment 597 is substantive, and noting that the Sentencing Commission did not label it as clarifying).

If the amendment is indeed substantive in nature, application of the November 2000 Sentencing Guidelines would still not violate the *ex post facto* clause if the fraud continued after the effective date of the amendment. *See, e.g., United States v. Moscony,* 927 F.2d 742, 754 (3d Cir. 1991) (holding that application of Guidelines did not violate the *ex post facto* clause because RICO offense was a "straddle" crime that continued before and after the effective date of the Guidelines); *United States v. Zimmer,* 299 F.3d 710, 718 (8th Cir. 2002) (holding that application of an amended version of the Guidelines to a conspiracy which continues both before and after the amendment does not violate the *ex post facto* clause). According to Brennan, the ending date of the concealment of assets listed in Count One of the indictment was determined by either the evidence produced at trial, or the date the concealment was detected, both of which he claims point to an end date prior to November 2000. *See United States v. Bakker,* 925 F.2d 728, 739 (4th Cir. 1991) (holding that court should not use ending date of indictment as determination of when continuing violation ended, but should look at the evidence introduced at trial); *United States v. Stein,* 233 F.3d 6, 18-19 (1st Cir. 2000) (stating that bankruptcy concealment goes on "until detected or its consequences are purged"); *United States v. Nash,* 115 F.3d 1431, 1441 (9th Cir. 1997) (looking beyond indictment to evidence produced at trial in order to determine whether bank fraud continued beyond the start date of the Sentencing Guidelines). Brennan presumes the relevant detection is detection by government prosecutors, which he argues necessarily occurred prior to the filing on November 1, 2000 of the indictment containing charges involving bearer bonds.

The Government argues that the relevant date is the date the concealment was detected *by the Bankruptcy Court and the United States Trustee.* Since the first superceding

indictment containing the bearer bond charges was not filed until November 1, 2000, and Brennan did not reveal the existence of his bonds to the Bankruptcy Court or any trustee until the indictment was filed, the Government suggests the fraud was ongoing as of the effective date of the amendment. In addition, the Government argues that proof at trial established that the violation continued after November 2000 since Brennan was convicted under Count One of concealing assets from August 7, 1995 until January 24, 2001.[6]

A debtor violates 18 U.S.C. § 152(1) by "knowingly and fraudulently conceal[ing] from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, *or, in connection with a case under title 11, from creditors or the United States Trustee*, any property belonging to the estate of a debtor." Brennan filed for bankruptcy under Chapter 11, so under § 152(1) the concealment was ongoing as long as Brennan did not reveal the existence of his assets to the United States Trustee. The date the prosecutors discovered the crime does not affect whether the crime was still being perpetrated. Thus, since Brennan admittedly did not reveal the existence of the bearer bonds to the Bankruptcy Court or United States Trustee until after the indictment, the concealment component of the fraud was ongoing as of November 1, 2000, and there is no violation of the *ex post facto* clause.

IX. *Two Level Enhancement for Obstruction of Justice*

Count 13 of the third superceding indictment charged Brennan with laundering $100,000 in bearer bond proceeds through a nominee account with New World Aviation to pay

---

6. Alternatively, the Government argues that bankruptcy fraud is a continuing violation which only ends when the debtor is discharged or a discharge is denied, and because the civil bankruptcy proceeding was still ongoing at the time of the criminal trial, the District Court properly applied the November 2000 Guidelines. *See* 18 U.S.C. § 3284 ("The concealment of assets of a debtor . . . shall be deemed to be a continuing offense until the debtor shall have been finally discharged or a discharge denied, and the period of limitations shall not begin to run until such final discharge or denial of discharge.")

for the charter of aircraft for Brennan and related travel expenses.

On March 2, 2001, less than one week before trial, Brennan produced copies of eight letters to the Government as reciprocal discovery. The letters, which were dated from November 9, 1998 to December 21, 1999, were addressed from Brennan to Bond. They purported to show that the $100,000, as well as an additional $675,000 Bond had wired to New World Aviation on Brennan's behalf, had come from investors associated with Bond who had hired Brennan as a consultant to research ports of call around the world. Brennan asserted that his around-the-world travel was undertaken in preparation for the creation of a time-share club on the Savarona, the largest private yacht in the world.

After conducting an investigation regarding the letters, the Government believed that Brennan had fabricated the letters in an attempt to provide a legitimate explanation for the $100,000 in bearer bond proceeds. In order to refute Brennan's explanation, the Government submitted evidence at trial demonstrating the following: (1) that, on January 25, 1999, Bond transferred $100,000 to New World Aviation on Brennan's behalf, which was used for a private jet trip to the Carribean; and (2) Bond subsequently transferred an additional $675,000 which Brennan used for an around-the-world trip. During direct examination, Bond testified that he had never heard of a ship called the Savarona, that he was not involved in any project with Brennan relating to this ship and that he had not put together a group of investors for this ship. Bond acknowledged that he had recently been shown Brennan's letters regarding the Savarona, but he affirmed that he never received any of the eight letters. Ultimately, Brennan decided not to use the letters as evidence in his case.

In addition to Bond, three other witnesses were questioned at trial about the Savarona venture. Robert Ettinger, the president of New World Aviation, testified that although he helped Brennan plan his around-the-world trip, Brennan had never mentioned the Savarona to him. Suzanne Citron, a part-owner of New World Aviation and social friend of Brennan's, accompanied him on the

February trip to the Caribbean that was supposedly related to the Savarona, but testified that Brennan made no mention of the Savarona to her. Donald Conway, the bankruptcy trustee, testified that Brennan never told him anything about a business deal involving the Savarona. Conway further testified that when he became aware of Brennan's travels, Brennan informed him that the trips were being funded by the family of Brennan's girlfriend. At sentencing, during the direct examination of Special Agent Sica, the Government established that these eight letters were the only written communication in the entire record addressed to Bond directly from Brennan. With the exception of these self-serving letters, Brennan had attempted to keep his dealings with Bond private. Brennan, according to Bond's trial testimony, even had Bond use a code name when they spoke on the phone and asked Bond to destroy copies of all statements relating to Brennan's holdings. Notably, no reply letters from Bond to Brennan were produced or introduced at trial.

At sentencing, the District Court concluded that Brennan had fabricated the letters, and enhanced Brennan's total offense score by two levels for obstruction of justice. Brennan argues that the District Court erred in imposing the two level enhancement for obstruction of justice because it impermissibly shifted the burden to Brennan to prove that the letters were not fabricated.

We review adjustments under § 3C1.1 of the Sentencing Guidelines under a two part standard. A district court's factual determination of willful obstruction of justice is reviewed for clear error, while its legal interpretation and application of the sentencing guidelines is reviewed under a plenary standard. *See United States v. Powell*, 113 F.3d 464, 467 (3d Cir. 1997). However, Brennan's failure to object at sentencing to the District Court's erroneous legal determination regarding allocation of the burden of proof limits our review to plain error. *See United States v. Clark*, 237 F.3d 293, at 299-300 (3d Cir. 2001).

In seeking a sentencing enhancement, the Government acknowledged that it had the burden of establishing, by a preponderance of the evidence, the facts that would support the enhancement. *See United States v. Helbling*,

209 F.3d 226, 250 (3d Cir. 2000). However, at Brennan's sentencing hearing, the District Court incorrectly stated, on three separate occasions, that Brennan had the burden of proving by a preponderance of evidence that the enhancement for obstruction of justice was not applicable. Nonetheless, Brennan did not object to any of the District Court's misstatements concerning the burden of proof.

The Government concedes that the District Judge's misstatements regarding the appropriate burden of proof constituted an "error" that was "plain," but argues that the error was harmless because it did not affect the outcome of the sentencing. *See United States v. Olano*, 507 U.S. 725, 732 (1993). The error was harmless, according to the Government, because the District Court found that the facts as presented in the presentence report were "fully supported by the evidence," and essentially corrected the earlier misstatements by declaring that the Government "clearly and convincingly at least establishes that what we have here are false statements." Although the District Court's statements regarding the burden of proof were plainly wrong, we conclude that the Court ultimately placed the burden where it belonged: on the Government.[7] For that reason, we turn to whether the Court's finding was clearly erroneous.

In making its determination that Brennan fabricated the letters, the District Court relied on trial testimony by Bond, Robert Ettinger and Donald Conway, which the Court deemed "credible." The District Court emphasized that the record contained no responses from Bond to Brennan's letters. Finally, the District Court evaluated the letters and found them to be "inherently unbelievable and incredible," and determined that "it's been established by clear and convincing evidence that we do have obstruction of justice here." We conclude that the District Court's factual findings regarding the authenticity of the letters were not clearly erroneous.

---

7. If anything, the District Court raised the bar for the Government by applying the clear and convincing evidence standard, rather than the easier standard that was applicable here, preponderance of the evidence.

Because the District Court did not clearly err in determining that the Government established that the letters were fabricated and constituted obstruction of justice, its misstatements regarding the burden of proof did not affect the outcome of the sentence. Therefore, we will affirm the judgment of the District Court with respect to the sentence enhancement for obstruction of justice.

X. *Conclusion*

We conclude that there was no prosecutorial misconduct, Brennan's conviction was not against the weight of the evidence, the supplemental charge was not coercive, the loss calculation for the purpose of sentencing was correct, there was no violation of the *ex post facto* clause, the findings supporting the obstruction of justice enhancement were not clearly erroneous, and the District Court's misstatement of the burden of proof constituted harmless error. Accordingly, the District Court will be affirmed.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*