**UNITED STATES of America,
Plaintiff,**

v.

**Paul J. LEARY, Jr., and Travis
E. Leary, Defendants.**

**No. CRIM.A. 04–81–KAJ.**

United States District Court,
D. Delaware.

July 15, 2005.

ing a new trial on the basis of newly discovered evidence, the interest of justice, and for judgment of acquittal pursuant to Rules 33 and 29 of the Federal Rules of Criminal Procedure[.]" (collectively, Docket Item ["D.I."] 116; the "Motions".)[1] Having reviewed the motions and the parties' submissions in support and in opposition to them, I have determined that the Motions must be denied.

Colm F. Connolly, United States Attorney, District of Delaware; Keith M. Rosen, Assistant United States Attorney, District of Delaware; Ferris W. Wharton, Assistant United States Attorney, District of Delaware, Wilmington, DE, Counsel for Plaintiff.

Charles M. Oberly, III, Esquire; Oberly, Jennings & Rhodunda, P.A ., Wilmington, DE, Counsel for Defendant Paul J. Leary, Jr.

Edmund D. Lyons, Jr., Esquire; The Lyons Law Firm, Wilmington, DE, Counsel for Defendant Travis E. Leary.

## MEMORANDUM OPINION

JORDAN, District Judge.

## I. Introduction

Before me in this criminal case are the defendants' post-conviction motions "seek-

## II. Background[2]

On the evening of October 27, 2002, a restaurant and bar known as the "Yankee," located in Glasgow, Delaware, was burned beyond repair in a fire that was plainly a case of arson. The building in which the Yankee operated was owned and managed by a development company that also owned the rest of the shopping center in which the restaurant was located. The business of the Yankee, however, belonged to two young entrepreneurs, Paul Leary, Jr., and his brother Travis.[3] The Leary brothers had successfully operated a sandwich shop together and, in acquiring the Yankee, they were determined to step to a higher level of business risk and reward. They purchased the business for $150,000 from a partnership that was, like the Learys, also essentially a family business, two of the partners being relatives named Oz-

---

1. Defendant Travis Leary had earlier filed a separate motion pursuant to Federal Rule of Criminal Procedure 33, seeking a new trial on the theory that the jury's verdict is "against the great weight of the evidence." (D.I. 93 at 1.) That motion expressly requested leave to "submit a supplementation" at a later date. (*Id.* at 2.) No further briefing on that motion was submitted but, pursuant to a stipulation among the parties (D.I.110), additional time was granted for the filing of post-trial motions. The motions noted above were filed in accordance with that stipulation. The earlier motion filed by Travis Leary is thus superceded by the motions now under consideration.

2. This background information is drawn from the trial record in general and is not an attempt to represent facts found by the jury, nor does it constitute findings of fact by the court.

3. Although the ownership structure of the restaurant was not the subject of detailed testimony, the Learys' father, Paul Leary, Sr., also may have had an ownership interest in the Yankee. With no intention to be unduly familiar, I will at times, for ease of reference, identify the Leary brothers solely by their first names.

demir.[4] The Learys then poured significant time and effort into preparing the restaurant to reopen under their management. Their parents and Paul's wife also invested sweat equity in the enterprise. When the Learys opened the restaurant as their own in August of 2002, it was a proud and happy day for the entire family.

Storm clouds appeared quickly, however. The Ozdemirs had taken half of the purchase price in the form of a note. The Learys believed that, because of problems they discovered at the Yankee after the purchase, they were entitled to offset their obligations on the note by the sums they had paid to rectify those problems. They thus found themselves at odds with the former owners almost immediately. Further complicating matters, the Learys had failed to obtain a liquor license and were serving alcohol illegally. They were purchasing their liquor supplies under a license that had been issued to someone who had owned the Yankee before the Ozdemirs. Quite rightly, the Learys believed that it was in their interest to obtain the necessary license, and they hired an attorney to help them with that process. They apparently took some comfort from their belief that their agreement with the Ozdemirs allowed the business acquisition to be rescinded if a proper liquor license could not be obtained.

The Learys worked long hours virtually every day at the restaurant. Paul managed the purchase and preparation of food and drinks, while Travis managed the waitstaff and dealt with the customers. They were not able to draw a regular salary but occasionally took a draw from the operating income of the business. The business also paid for their health insurance.

Insurance on the business itself became a particular point of discussion soon after the Learys began operating the Yankee. In mid-October of 2002, Paul called the insurance agent who had assisted them with acquiring property and casualty insurance prior to their re-opening the restaurant. After consultation with Travis, Paul directed the agent to increase the insurance on the business, which included coverage for losses caused by fire. For a modest increase in premiums, coverage was increased from $100,000 for restaurant equipment and $100,000 for business personal property to $200,000 for restaurant equipment and $125,000 for business personal property, or a total increase of $125,000 in coverage beyond the levels which had initially been set. The business also carried business interruption insurance. The agent, who had years of experience and had been to the restaurant site, agreed that the levels of coverage carried for the Yankee were reasonable, even after the mid-October increases.

Approximately one week before Paul told the agent to bind the new coverage limits, Travis Leary had a noteworthy discussion with a representative of the landlord of the premises in which the Yankee operated. The landlord was not aware that the Yankee's business had been sold. From the landlord's perspective, the Learys were new partners in the existing business. They had not taken over the lease but had merely been added to it, while the Ozdemirs remained obligated on the lease. On October 7, 2002, Travis called and asked the landlord's representative about who insured the Yankee and what the coverages were. After asking about damage caused by war or by earthquake, he

---

4. Again for ease reference, the former owners will be referred to collectively as the Ozde- mirs.

asked several questions about insurance coverage for fire damage and was told that the landlord carried insurance on the building but that the operators of the restaurant needed their own insurance on the contents of the building. The landlord's representative made particular note of the conversation because it struck her as odd that Travis had so many questions about fires and fire insurance, and because Travis ended the conversation by emphasizing that the restaurant premises were old. In over thirty years of working with the landlord, she had never had a conversation like it, and it prompted her to immediately comment on it to her co-workers and to memorialize it in an office file.

On Sunday, October 27, 2002, Travis went with the young woman he was then dating, Danielle Donovan, to a store in Newark, Delaware and purchased a package of candle wicks. That night, the inside of the Yankee was doused in various spots with gasoline and set afire. The arsonist or arsonists also attempted to set fire to gas cans by soaking rags with gasoline and trailing them from the spouts of the cans.[5] In one instance at least, that homemade fuse was augmented by a length of candle wick. There were no apparent signs of forced entry to the restaurant,[6] and members of the Leary family had the only keys to the premises.

Following the fire, the Learys, though they had operated the Yankee for only three months at a roughly break-even rate of business, filed an insurance claim for more than $700,000 in losses. Investigators for the insurance company and law enforcement agencies concluded that the Leary brothers had conspired with one another to set the fire. On August 12, 2004, the Learys were indicted for conspiracy, arson, and mail fraud.[7] (D.I.2.) The case was tried to a jury for two weeks, from April 6 to April 20, 2005. The Learys presented an alibi defense,[8] claiming that they left the restaurant together shortly before 10:00 p.m. and went to Travis's home, where they counted money for deposit in the bank. On April 21, 2005, the jury returned a verdict of guilty on all counts against both defendants. (D.I.84.)

Paul Leary now moves for a new trial under Federal Rule of Criminal Procedure 33, based on newly discovered evidence, namely evidence that Danielle Donovan gave "false testimony on a material issue going to the heart of the Government's case." (D.I. 116 at 6–7.) Both defendants move under Rule 33 for a new trial based on their allegation that the Government withheld exculpatory evidence. (D.I. 116 at 7.) Both defendants also move for a new trial based on a variety of allegations amounting to the assertion that a new trial is required in the interest of justice. (See id.) Finally, Paul Leary moves under Rule 29 for a judgment of acquittal "because based upon the evidence presented no rational trier of fact could have found

---

5. The contents of the gas cans did not ignite or explode because, it seems, the fuel mixture was too rich, the arsonist having filled the cans too full of fuel.

6. There was, however, a hole of relatively small size in one of the windows.

7. The conspiracy charges were brought pursuant to 18 U.S.C. §§ 371 and 844(n). The arson charges were brought pursuant to 18 U.S.C. §§ 2 and 844(i). The mail fraud charges were brought pursuant to 18 U.S.C. §§ 2 and 1341.

8. Travis testified, but Paul did not. Nevertheless, both defendants relied on the alibi asserted in Travis's testimony. (See, e.g., 4/19/05 Tr. at 233.) The defendants also relied on other witnesses, through direct and cross examination, in their effort to establish a time line of events consistent with their alibi.

him guilty beyond a reasonable doubt." (*Id.*)

## III. Standards of Review

### A. *Motions for New Trial*

Both defendants seek a new trial pursuant to Federal Rule of Criminal Procedure 33. (D.I. 116 at 1–25.)[9] Motions for a new trial are evaluated by different tests, depending on the argument being advanced.

#### 1. *Newly Discovered Evidence*

Rule 33 allows for a new trial if there is newly discovered evidence and if "five essential requisites" are met:

1. The evidence must have been discovered after the trial;

2. The failure to learn of the evidence must not have been caused by defendant's lack of diligence;

3. The new evidence must not be merely cumulative or impeaching;

4. It must be material to the principal issues involved; and

5. It must be of such a nature that in a new trial it would probably produce an acquittal.

*United States v. Meyers,* 484 F.2d 113, 116 (3d Cir.1973). This test is commonly referred to as the "Berry" test, *id.,* after the nineteenth century case in which it originated. *See* 3 Charles A.Wright, Nancy J. King, Susan R. Klein & Sarah N. Welling, Fed. Prac. & Proc.Crim. (3d ed.) § 557 n. 4 (citing *Berry v. State,* 1851 WL 1405, 10 Ga. 511, 527, as the source of the test).[10]

■ When the newly discovered evidence involves exculpatory evidence that the Government had in its possession, the rule in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) is impli-

9. One of the arguments advanced under the "newly discovered evidence" heading is by Paul Leary alone, as is described in more detail herein (*see infra* at Sec. IV.A.1).

10. Paul Leary contends that, for cases involving perjury, the United States Court of Appeals for the Third Circuit has adopted a test that originated in the Seventh Circuit's decision in *Larrison v. United States,* 24 F.2d 82 (7th Cir.1928). (*See* D.I. 116 at 1–3; D.I. 146 at 1–3.) The so-called *Larrison* rule calls for a new trial when "(a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury *might* have reached a different conclusion. (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." *Id.* at 87–88 (emphasis added). The Government correctly counters (D.I. 142 at 3–4) that the Third Circuit has never adopted the *Larrison* rule. *See Government of Virgin Islands v. Lima,* 774 F.2d 1245, 1251 n. 4 (3d Cir.1985) ("The *Larrison* test has not been adopted by this Court ...."), and that even the Seventh Circuit has recently abandoned it, *see United States v. Mitrione,* 357 F.3d 712,

718 (7th Cir.2004) ("This old test puts our circuit at odds with other circuits which, absent a finding that the government knowingly sponsored the false testimony, require a defendant seeking a new trial to show that the jury would *probably* have reached a different verdict had the perjury not occurred.... Today, we overrule *Larrison* and adopt the reasonable probability test."). The only Third Circuit case cited by the defendants as applying the *Larrison* rule is *United States v. Massac,* 867 F.2d 174 (3d Cir.1989). In that case, however, the Court stated that its earlier precedent "did not flatly adopt the *Larrison* rule[,]" *id.* at 178, and the Court apparently applied the rule only because the parties before the district court had agreed to have the case decided under that rule. *See id.* ("the district court stated in its Memorandum Opinion ... that the parties agreed that the so-called *Larrison* rule should be applied"). The proper test, in short, is not a "might have" test; it is the test prescribed by the *Berry* rule. *Cf. United States v. Stofsky,* 527 F.2d 237, 245–46 (2d Cir.1975) (describing reasons for rejecting *Larrison* rule).

cated and the standard for obtaining a new trial is somewhat relaxed.[11] Generally speaking,

> [f]or Rule 33 motions [based on newly discovered evidence], the evidence must create an *actual probability* that an acquittal would have resulted if the evidence had been available. If, on the other hand, the government possesses *Brady* evidence but does not disclose it, ... the non-disclosure warrants a new trial if the evidence is "material." It is "material" only if there is a "reasonable probability" that the evidence would have changed the result.

*United States v. Josleyn*, 206 F.3d 144, 151 (1st Cir.2000) (emphasis in original; internal quotation marks and citations omitted); *cf. United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (conviction must be set aside if withheld *Brady* material "creates a reasonable doubt that did not otherwise exist").[12]

---

**11.** "*Brady* requires that the prosecution turn over evidence which is favorable and material to the defense." *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir.1993); *see also United States v. Josleyn*, 206 F.3d 144, 151 (1st Cir. 2000) (*Brady* "requires the government to produce to defendants exculpatory and impeachment evidence that is in its custody, possession, and control ....").

**12.** The Supreme Court has described three categories of cases in which the *Brady* rule applies. "In the first situation, ... the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Agurs*, 427 U.S. at 103, 96 S.Ct. 2392. In such a case, the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* "The second situation ... is characterized by a pretrial request for specific evidence." *Id.* at 104, 96 S.Ct. 2392. If a sufficiently specific request is made and the requested material is not delivered to the defense, then a

## 2. *Interest of Justice*

■ Rule 33 also provides that a new trial may be ordered for reasons besides newly discovered evidence, "if the interest of justice so requires." Such arguments are often couched in terms of the weight of the evidence.[13] The process for evaluating them calls for the court to "not view the evidence favorably to the Government, but instead [to] exercise[ ] its own judgment in assessing the Government's case." *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir.), *cert. denied*, 540 U.S. 898, 124 S.Ct. 248, 157 L.Ed.2d 178 (2003). Motions for a new trial in the interest of justice are committed to the sound discretion of the district court, *id.*, but the standard for reviewing them is extraordinarily high. "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Brennan*, 326 F.3d

---

new trial is warranted, if "the suppressed evidence might have affected the outcome of the trial." *See id.* Finally, in the third category of cases, in which either no request for information is made or only a general request is made, a conviction must be set aside "if the omitted evidence creates a reasonable doubt that did not otherwise exist ...." *See id.* at 112, 96 S.Ct. 2392. In the case at bar, neither the first nor the second circumstances are presented.

**13.** The argument is distinct from the assertion that the evidence is insufficient to sustain the verdict, which would lead to acquittal under Federal Rule of Criminal Procedure 29. In discussing their "interest of justice" arguments for a new trial, the defendants acknowledge that their position is in essence that the verdict is contrary to the weight of the evidence. (*See* D.I. 116 at 4–5 (under heading "New Trial—Interest of Justice," the defendants point to "the test used when evaluating a request for a new trial based upon a claim that the verdict is against the weight of the evidence").)

176, 189 (citation and internal quotation marks omitted). Thus, "[m]otions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." *Government of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir.1987) (citations omitted).

### B. *Motion for Judgment of Acquittal*

Paul Leary moves in his own right for a judgment of acquittal pursuant to Federal Rule of Civil Procedure 29, arguing that the evidence adduced at trial is insufficient to sustain the verdict against him. (D.I. 116 at 6, 44–45.)

> In ruling on a motion for judgment of acquittal ..., a district court must review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence. A finding of insufficiency should be confined to cases where the prosecution's failure is clear. Courts must be ever vigilant in the context of Fed.R.Crim.P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury.

*United States v. Brodie*, 403 F.3d 123, 133 (3d Cir.2005) (internal quotation marks and citations omitted).

### IV. Discussion

I address the motions and arguments in the same order in which they were presented by the defendants.

### A. *Motions for New Trial*

#### 1. *New Evidence—The Travis Leary and Ms. Donovan Affair*

█ Paul Leary argues that he is "entitled to a new trial as a result of newly discovered evidence that Government witness Danielle Donovan gave false testimony on a material issue going to the heart of the Government's case, which testimony, if omitted, might have resulted in a different verdict." (D.I. 116 at 6–7.) The evidence he points to, however, does not go to the heart of the case and, importantly, it makes no legal difference if its introduction "might" have caused a different outcome in the case. As noted (*supra* at Sec. III.A.1. & n. 10), the controlling *Berry* test sets forth five factors, all of which must be met in order for a new trial to be granted under Rule 33. Paul's "new evidence" motion fails to meet three of the five factors and therefore must be denied.

The new evidence includes a series of e-mails between Ms. Donovan and Travis Leary that indicate the two had a continuing sexual relationship that lasted until sometime in the Fall of 2004, after both had married other people and long after the time that the jury was led to believe the relationship had ended. (*See* 4/11/05 Tr. at 109 (testimony of Ms. Donovan that she had been married approximately two years, or since the Spring of 2003); 4/18/05 Tr. at 36 (testimony of Travis Leary that he had been married for approximately one year, or since the Spring of 2004).) The e-mails also indicate that the relationship ended in a decidedly different manner than had been argued to the jury. (*See* D.I. 117 at Ex. 20, 5/20/05 Tr. excerpt at E–20 (prosecution rebuttal argument that Ms. Donovan was simply "a scared young woman ... who has moved on in her life and gotten married").) The defendants have produced six e-mails from Ms. Donovan to Travis, bearing dates from October 14, 2004 to November 17, 2004.[14] (*Id.* at Ex. 24.) The e-mails reveal Ms. Donovan

14. In addition to those six e-mails, the Government has produced another forty e-mails

as pining for the romantic attachment she had once enjoyed with Travis (*see id.* at Ex. 24), 11/11/04 e-mail (Ms. Donovan stating, "I've never felt this kind of miss like I do for you, . . . I'll die if I can't see you") and bitter over Travis's marriage and the impending birth of his child (*see id.* at Ex. 24, 11/2/04 e-mail (Ms. Donovan remarking on Mrs. Travis Leary's pregnancy and calling her "my worst enemy"). The new evidence also includes Travis's assertion that Ms. Donovan accosted him at his home and accused him of being the father of a fetus she was then carrying and which she later miscarried or had aborted. (*See id.* at Ex. 24, ¶ 8; Ex. 22, ¶ 5.)

According to Paul, this evidence of his brother's and Ms. Donovan's extended affair "would have aided [his] defense" and "provide[d] a motive as to why Danielle Donovan would offer false testimony, i.e. her intense dislike if not hatred towards Travis's wife[.]" (D.I. 116 at 15–16.) Even if true, however, those points fail to meet the test for evidence warranting a new trial.

I do not doubt that Paul and his attorney were unaware until after the trial that the intimate relationship between Travis and Ms. Donovan continued as long as it did, and so the newly produced evidence of the affair does meet the first of the five requirements of the *Berry* test. *Meyers*, 484 F.2d at 116 (first prong of *Berry* test requires that "[t]he evidence must have been discovered after the trial"). I am also prepared to accept that Paul's and his lawyer's ignorance of the affair was not the result of any lack of diligence on their part in investigating the case. *Id.* (second prong of *Berry* test requires that "[t]he failure to learn of the evidence must not have been caused by defendant's lack of diligence"). The remaining three prongs of the *Berry* test require that the new evidence be more than "merely cumulative or impeaching," that it be "material to the principal issues involved," and that it be "of such a nature that in a new trial it would probably produce an acquittal." *Id.* The newly revealed evidence fails on each of those points.

First, despite Paul Leary's assertions to the contrary (D.I. 116 at 15), the information is relevant solely for its impeachment value. The heat generated between Travis and Ms. Donovan sheds no light whatsoever on who burned down the Yankee Restaurant. The new evidence may indeed, as

from Ms. Donovan to Travis which cast the conversation in more salacious terms. (D.I. 142.) No one has produced any of Travis Leary's e-mails to Ms. Donovan, although it seems clear from Ms. Donovan's side of the on-going communication that Travis's messages to her were at times similarly graphic and that he was sufficiently invested in the illicit relationship that he was prepared to exact from himself and others a high cost to continue it. He was willing to deceive his wife and risk the attendant emotional trauma that the affair's revelation would likely cause. (*See* D.I. 117 at Ex. 24, ¶ 12 (Travis Leary explaining his failure to reveal the e-mails by saying, "I wished to spare my wife . . . the pain such a disclosure would bring").) He was also willing to mislead, either directly or indirectly, his attorney (*see id.* at Ex. 21, ¶ 2), his brother (*see id.* at Ex. 22, ¶¶ 2–5), and his

brother's attorney (*see id.* at Ex. 23, ¶¶ 2–6), all of which is particularly remarkable because he knew that his and his brother's reputations, financial interests, and freedom from incarceration were at stake, not to mention the fervent hopes of his parents, his brother's wife and children, and his own wife. He apparently continues his willingness to deceive in an effort to cover up the extent of the affair, as the more complete e-mail record submitted by the Government demonstrates. In his post-trial affidavit providing six e-mails from Ms. Donovan, Travis swears that his "physically intimate relationship with Danielle Donovan . . . lasted until approximately Spring 2004." (*Id.* at Ex. 24, ¶ 5.) The more complete e-mail record shows, however, that the trysts continued throughout the Summer and into the Fall of that year. (*See, e.g.,* D.I. 142 at 9/13/04 e-mail and 10/8/04 e-mail.)

Paul argues, provide a reason to disbelieve some or all of Ms. Donovan's testimony. But that, by definition, is impeachment. *See* Black's Law Dictionary (8th ed., 2004) at 768 (defining "impeachment" to mean, "to discredit the veracity of (a witness)"). It is not substantive evidence of the guilt or innocence of anyone for the crimes charged in this case.

Paul's argument that the evidence goes beyond mere impeachment appears to hinge on the assertion that Ms. Donovan perjured herself in testifying about a specific phone call she received on the night of the fire. (*See* D.I. 116 at 12–14; D.I. 146 at 6.) Paul points out that Ms. Donovan was repeatedly interviewed by Government investigators and consistently said that, although Travis Leary's phone records show that Travis called her cell phone at 10:48 p.m. and again at 10:50 p.m. that night, she had no recollection of those calls and probably did not hear her cell phone ring. (D.I. 116 at 9.) When she testified before the grand jury, she swore under oath that she called Travis earlier in the evening, went to bed, and did not speak to him again until around 11:30 p.m., after the fire had been discovered. (D.I. 116 at 9–10; D.I. 117 at Ex. 8.) At trial, however, she testified that she did recall receiving a call at about 10:50 p.m., that Travis told her he had finished working at the restaurant and that he was going to Paul's house. (D.I. 116 at 13; D.I. 117 at Ex. 16.) She specifically recalled hearing in the background the sound of Travis's car, which was distinctively loud. (*Id.*) According to Paul, this new version of events "explod[ed] Travis and Paul's alibi defense" (D.I. 116 at 12), which was that the brothers had left the restaurant nearly an hour earlier, at about 9:50 p.m. (4/18/05 Tr. at

211–12, 220–21), and drove the short distance to Travis's house, where they prepared money from the restaurant to be deposited in the bank (*id.* at 217–21), until Paul went to his home about an hour later and Travis remained at his home watching television (*id.* at 221–22).

Paul presses the argument that evidence of the affair proves Ms. Donovan's testimony at trial was false and that a new trial is warranted "either automatically or if there is any reasonable likelihood the false testimony could have affected the judgment of the jury." (D.I. 146 at 6 (citing *United States v. Damblu*, 945 F.Supp. 672 (S.D.N.Y.1996), *aff'd*, 134 F.3d 490 (2d Cir. 1998).) I still am unable to see how this line of reasoning, if accepted, lifts the love/lust messages beyond the realm of strict impeachment evidence. The argument contains two unstated and questionable assumptions. First, it assumes that the testimony about the 10:50 p.m. phone call was perjured, and, second, it assumes that evidence of the affair is proof of that. As to the first point, a recollection recovered in the courtroom for the first time may be troubling but is not necessarily false. As to the second, evidence of the affair does not demonstrate that the testimony about the phone call was false. This brings us back again to what cannot be assumed away, namely that the evidence is purely impeaching and is so on a collateral matter. The new evidence may provide a motive to disbelieve Ms. Donovan because she was dishonest in other aspects of her life and dishonest about when the affair with Travis ended, but it is not in any sense contrary to her late-blooming memory of a phone conversation that she had not earlier recalled.[15] Paul's argument

---

**15.** It is the description of the call, in particular Ms. Donovan's assertion that she heard Travis's car engine roar, that is problematic for the defense. Paul does not contend that there was no phone conversation between his brother and Ms. Donovan at about 10:50 p.m.

that Ms. Donovan's testimony about the 10:50 p.m. phone call is perjury thus fails a "threshold inquiry," namely, whether the newly discovered evidence of the affair "demonstrates that the witness committed perjury." *Damblu*, 945 F.Supp. at 674.[16]

■ That, however does not entirely end the argument, because there is precedent indicating that impeachment evidence alone may sometimes be a basis for a new trial. *See United States v. Wong*, 78 F.3d 73, 79 (2d Cir.1996) ("Evidence of impeachment is material if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case.") (internal citations and quotation marks omitted); *United States v. Taglia*, 922 F.2d 413, 416 (7th Cir.1991) (rejecting blanket distinction between impeachment and substantive evidence, saying, "[n]othing in the text or history of Rule 33 ... supports a categorical distinction between types of evidence;" and positing, "[i]f the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he lied consistently in a string of previous cases, the district judge would have the power to grant a new trial ....."). In other words, if the impeaching evidence is particularly weighty in the context of the case, for example if it undermines the only evidence linking a defendant to the crime, it may warrant a new trial in itself. *Cf. Stofsky*, 527 F.2d at 246 ("Upon discovery of previous trial perjury by a government witness, the court should decide whether the jury probably would have altered its verdict if it had had the opportunity to appraise the impact of the newly-discovered evidence not only upon the factual elements of the government's case but also upon the credibility of the government's witness."); *United States v. Lipowski*, 423 F.Supp. 864, 867 (D.N.J. 1976) ("[I]t is within the Court's power to grant a new trial if it appears that had the impeaching evidence been introduced, it is likely that the jury would have reached a different verdict.") (internal citations omitted).[17]

---

He cannot, because Travis's testimony is that there in fact was such a conversation, albeit one that took place while he was sitting in his room, not driving home in his car. (4/18/05 Tr. at 221–22.)

16. In *Damblu*, for example, the newly discovered evidence on which the defense relied in seeking a new trial was evidence showing that a witness testified falsely about the identity of her common-law husband and of a third-party. 945 F.Supp. at 674. One can presumably prove that a statement identifying someone as "Mr. X" is false by showing that the person is actually "Mr. Y." Although that still leaves open the question of whether the statement was knowingly false, the point here is that such evidence does more than impeach; it actually contradicts the earlier testimony, unlike the solely and collaterally impeaching nature of the evidence of the affair. By contrast, Ms. Donovan's earlier statements and grand jury testimony about her phone contacts with Travis that night are the type of evidence which is more than merely impeaching. The inconsistencies between her earlier statements and her trial testimony do indeed provide fodder for impeachment, but they go beyond that because they can be viewed as contradictory to, or at least inconsistent with, the assertion that Travis was on the road at 10:50 p.m. on the night of the fire.

17. Since consideration should be given to the weight of the impeachment evidence and that is often done in the context of considering whether there has already been an attack on the witness to be impeached, it may be that the question in practice is whether the proffered evidence is impeaching *and* cumulative, rather than whether it is impeaching *or* cumulative. *Cf. United States v. Robinson*, 329 F.Supp. 723, 727 (D.Del.1971) (denying new trial because proffered "new" evidence was purely impeaching and, "[f]urthermore, the

Even when viewed in this way, however, Paul's motion rests on an inadequate foundation. I cannot say that the evidence of Ms. Donovan's affair and her cover-up of it are such that "it is likely that the jury would have reached a different verdict." *Lipowski*, 423 F.Supp. at 867. The defense had much more direct material than the affair to use for impeachment, and counsel used that ammunition effectively. In close and extensive questioning (*see* 4/11/05 Tr. at 182–200), defense counsel made skillful use of Ms. Donovan's earlier statements and testimony to the grand jury, highlighting the contradiction with her trial testimony about her new memory of the 10:50 p.m. phone call. *Cf. United States v. Williams*, No. 03–3498, 134 Fed. Appx. 510, 511 (3rd Cir., May 26, 2005) (non-precedential) (applying *Berry* test and stating that proffered evidence did not warrant a new trial because prosecution witnesses were already "vigorously impeached ... at trial" and it was "therefore, highly unlikely that additional credibility evidence ... would have altered the jury's decision to believe their testimony."). In short, while the proffered evidence is not on the same subject as the inconsistent statements used for impeachment, it is nevertheless cumulative in the sense that it is no more than a further attack on her credibility.

For much the same reasons,[18] the newly discovered evidence also fails the fourth prong of the *Berry* test because it is not material to any issue in the case that could be characterized as "principal." This case revolved around the question of who burned the restaurant. How the perpetrator or perpetrators did it was largely known and was not contested. Why they did it was a matter of some dispute, but only as it bore on the question of who did it—was it the Leary brothers trying to force renovation of the premises and collect insurance money, or was it the Ozdemirs seeking to collect money on a note, or was it someone else with an altogether unknown motive? When the perpetrators did it was likewise of interest only insofar as it shed light on the question of who did it—did the Leary brothers' alibi hold up? Were the Ozdemirs in the vicinity at the time the fire was set? Paul does not identify any issue of substance, let alone one that could be called a "principal issue," as to which the evidence of the extended affair is relevant, nor am I able to discern any such issue.[19] Again, the sole value of the evidence would be for impeaching the credibility of Ms. Donovan.

Finally, the evidence fails the fifth *Berry* prong because it cannot be characterized as "of such a nature that ... it would probably produce an acquittal." *Meyers,* 484 F.2d at 116. Not even the movant is prepared to go that far. The most that Paul says or could say for the evidence is that, if the jury took the impeaching evidence as proof that Ms. Donovan's testimony could not be believed, "the jury might have reached a different verdict." (D.I.

---

evidence adds little to the sustained attack made upon Miss Price's credibility at trial. To that extent it is merely cumulative.").

18. The third and fourth prongs of the *Berry* test appear to pose largely overlapping analyses. To say that something is "merely impeaching," under the third prong, is arguably another way of saying that, under the fourth prong, it does not bear on a significant or "principal" issue in the case.

19. In this regard, the comment of Travis Leary is noteworthy, questionable though his judgment may be (*see supra* n. 14). He said he did not disclose the "complete nature" of his relationship with Ms. Donovan during 2003–2004 because he "believed it would not be relevant to the charges pending against [him] and [his] brother in Federal Court." (D.I. 117 at Ex. 24, ¶ 12.)

116 at 17.) But "might have" is simply not the applicable legal standard. (*See supra* n. 10.) The question is whether the evidence would "probably produce an acquittal," and the answer is "no." Even accepting for the sake of argument that Ms. Donovan's testimony about the 10:50 p.m. phone call was perjured and that evidence of the love affair was somehow proof of that, the operative law is not, as Paul contends, that a defendant is entitled to a new trial if there is "any reasonable likelihood the false testimony could have affected the judgment of the jury." (D.I. 146 at 6.) It is, rather, that "a new trial is required only where the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Damblu,* 945 F.Supp. at 674 (citations and internal quotation marks omitted) (citing *Wong,* 78 F.3d at 81, and *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991), *cert. denied,* 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993).)[20] That is an obviously higher hurdle and one that Paul Leary cannot clear in this case because, even if one were to entirely reject Ms. Donovan's testimony, there is still sufficient evidence (*see infra* at Sec. IV.A.3.g.), from which a rational jury could have concluded that the defendants committed the crimes for which they were convicted. *See United States v. Adams,* 759 F.2d 1099, 1108 (3d Cir.), *cert. denied,* 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985) ("Even if [allegedly newly discovered] evidence could convince the jury to disregard ... [the] testimony [of a particular prosecution witness] ...,

the other evidence in the case was more than sufficient to sustain a finding of guilt.")

Accordingly, the motion for a new trial based on the newly discovered evidence of the affair between Ms. Donovan and Travis Leary must be denied.

### 2. *New Evidence—Brady Violations*

Both defendants join in a motion for a new trial on the basis of what they claim are newly discovered violations of the Government's *Brady* responsibility to disclose exculpatory evidence. (D.I. 116 at 3–4; 18–25.) Specifically, they point to two pieces of evidence which they say should have been given to them by Government investigators but were not: first, an employment time record for Ashley Ford, who was the girlfriend of Shawn Naylor, a bartender at the Yankee Restaurant (*id.* at 21–24), and, second, a statement made by one of the Learys' cousins, David Jochen (*id.* at 24–25).

#### a. Ms. Ford's Time Record

As to the significance of Ms. Ford's time record, the defendants note that the time when Mr. Naylor left the Yankee on the night of the fire is a matter of serious consequence and, they reason, when he left the Yankee was dependent on when Ms. Ford left her job. (*See id.* at 22–25.) Mr. Naylor testified at trial that, when he left the Yankee that night, both Travis and Paul were still there.[21] (D.I. 117 at Ex. 40.) Mr. Naylor had told investigators

---

**20.** That rule is predicated on the Government not being aware of the alleged perjury, *Damblu,* 945 F.Supp. at 674, a point which Paul Leary concedes in this case. (D.I. 146 at 4.) He does assert that the Government "should have known that Mrs. Donovan was being untruthful about her relationship with Travis Leary" (*id.*), but, even if that were so, it misses the point. The predicate question is

whether the Government knew that Ms. Donovan's testimony about the 10:50 phone call was perjured.

**21.** More precisely, he testified that Travis was there and that he believed Paul was there as well but he was not sure. (*See* 4/11/05 Tr. at 251.)

that he left the bar "somewhere around 10:00 to 10:15 p.m." and he later confirmed that estimate in testimony before the grand jury. (D.I. 116 at 21–22.) Defense counsel made a point at trial while cross-examining Mr. Naylor to elicit that estimate and the fact that it had been given to investigators. (4/11/05 Tr. at 262–63.) Defense counsel also asked if Mr. Naylor had "any particular reason to make special note of the time? Was there any particular reason why you would have said, got to go?" (*Id.* at 259.) Mr. Naylor responded, "I had to meet—the whole reason I left at that time would be to meet my girlfriend at my house because we were going to Delaware Park." (*Id.*) Evidently, Ms. Ford got off of work that night at 9:31 p.m., according to time records that Agent Gemmato obtained before trial from her employer. (*See* D.I. 116 at 23; D.I. 117 at Ex. 47; D.I. 142 at 10.) The defendants contend that the time sheet showing that Ms. Ford clocked out at 9:31 p.m. calls into question Mr. Naylor's memory that he left the Yankee between 10 and 10:15 p.m. to meet her. (D.I. 116 at 23.)

The timing of Mr. Naylor's departure was a significant factor in the Government's reconstruction of the timeline of events on the night of the fire because it placed both Travis and Paul at the Yankee at a time inconsistent with their alibi but consistent with their setting the fire. (*See id.* at 22–23.) The defendants therefore contend that the time record showing Ms. Ford's clocking out at 9:30 p.m. is exculpatory since it implies Mr. Naylor's departure time, which was set to allow him to meet Ms. Ford, was earlier in the evening. (*See id.*) This evidence is particularly important, the defendants argue, because Agent Gemmato had handwritten notes of an interview with Mr. Naylor sometime during the "first couple of weeks" after the fire (D.I. 117 at Ex. 49), notes which include an indication that the Yankee closed

between 9:15 and 9:30 p.m. and then a notation stating "Travis & Paul 9:45 p.m." (*Id.* at Ex. 50.) According to the defendants, "[t]here is no other logical explanation" for that notation except that Mr. Naylor had told Agent Gemmato that he left the restaurant at 9:45 p.m. and that Travis and Paul were still there at that time. (D.I. 116 at 24.)

The Government does not dispute that Agent Gemmato had the time record showing that Ms. Ford clocked out of her job at 9:31 p.m. on the night of the fire. It does not claim to have made a deliberate and justifiable decision to withhold the document. It says that, in light of the Government's "open file discovery policy" (D.I. 142 at 11; emphasis omitted), the failure to turn over the time record is "regrettable" but was simply a mistake and does not constitute a *Brady* violation. (*Id.*)

According to the Government, the time record is not *Brady* material because it is not exculpatory. The Government asserts that Mr. Naylor's testimony showed he was focused not on when his girlfriend got off of work but on when he needed to meet her at his home in order to go to Delaware Park that night. (*See id.* at 12.) Thus, the Government says, there is no reason to believe that seeing the time record would change Mr. Naylor's testimony about when he left the Yankee. (*Id.* at 11–12.) Moreover, the Government argues, the most that could be said of the time record is that, if its use in cross-examining Mr. Naylor caused him to recant his earlier and repeated statements about when he left the restaurant that evening, and if it prompted him to say that Agent Gemmato's handwritten interview note, "Travis & Paul 9:45 p.m.," meant that Travis and Paul were still at the restaurant when he, Naylor, left that night, then Mr. Naylor's revised testimony would be less incriminating than the testimony he in fact gave.

(*Id.* at 13.) It would be less incriminating, because, unlike his trial testimony, it would not put the brothers directly at the scene later than was asserted in Travis's alibi testimony. But, of course, "less incriminating" is not "exculpatory."

■ The Government's argument is correct. In a situation such as the one here (*see supra* n. 12), the question is whether the undisclosed evidence "creates a reasonable doubt that did not otherwise exist," *Agurs,* 427 U.S. at 112, 96 S.Ct. 2392, or, in other words, whether there is a "reasonable probability" that the evidence would have changed the result, *Joselyn,* 206 F.3d at 151. Even if one were to assume that all of the contingencies attached to the defendants' reasoning came out in the defendants' favor, one is left with testimony by Mr. Naylor that is not exculpatory; it is still incriminating, only less so. Mr. Naylor's theoretically revised testimony would still leave the Leary brothers alone together in the restaurant at 9:45 p.m. and would say nothing to indicate what they did after that. It therefore cannot be said that the time record creates a reasonable doubt. *Cf. United States v. Rhodes,* 569 F.2d 384, 388 (5th Cir.) (prosecution was not required to disclose witnesses' failure to identify the defendant because "[t]he eyewitnesses did not state that the defendant was not one of the robbers. Rather, they testified that they could not state whether the defendant was or was not one of the perpetrators. The inference to be drawn from this testimony was of a neutral nature."), *cert. denied,* 439 U.S. 844, 99 S.Ct. 138, 58 L.Ed.2d 143 (1978).[22]

**b. David Jochen's statement**

A cousin of the Leary brothers', David Jochen, has submitted a post-trial affidavit in which he swears that he was interviewed by Government investigators shortly after the fire and told them the following:

> "On the night of the fire, I was there when the restaurant closed. I left the restaurant sometime after 9:00 p.m..... I ... walked out the back door of the Yankee Restaurant and went to my girlfriend's car. We ate food while in the parking lot. I observed Travis and Paul leave the restaurant shortly thereafter and briefly spoke with them. I saw Travis and Paul get into their vehicles. I know that as I left the parking lot, Travis Leary was behind me. I do not recall if Paul Leary followed Travis."

(D.I. 117 at Ex. 53.) According to the Leary's, this is exculpatory information that the Government should have turned over to them.

The Government does not dispute that Agent Gemmato interviewed Mr. Jochen, and it appears that the notes of that interview were given to the defendants in pre-trial discovery. (*See* D.I. 117 at Ex. 52.) The Government points out that nothing in Agent Gemmato's contemporaneous notes makes any reference to Mr. Jochen having seen or spoken with the defendants. (D.I. 142 at 14.) In addition, the Government has submitted an affidavit from Agent Gemmato in which he expressly denies that Mr. Jochen told him that "he saw and/or actually spoke to either or both of

---

**22.** Another way of expressing this conclusion is to say the time record does not pass the test of materiality because it is not reasonably probable that, if the record had been disclosed, the result of the trial would have been any different. *See United States v. Pflaumer,* 774 F.2d 1224, 1230 (3d Cir.1985) (noting standard to be applied for testing materiality of withheld *Brady* material is reasonable probability that, had it been disclosed, the result would have been different), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986).

the defendants as they left the restaurant on the night of the fire." (D.I. 142 at Ex. 1, ¶ 6.)

█ Mr. Jochen's affidavit does not create a *Brady* issue. It is utterly lacking in credibility because, leaving aside the bias the witness may have as a relative of the defendants, the affidavit is at odds with Agent Gemmato's contemporaneous notes from an interview of Mr. Jochen a day after the fire,[23] and, more significantly, it is at odds with the defendants' own behavior. As is right and proper, the defendants have spared no effort in defending themselves. They have retained able counsel and investigators and experts to assist them, and the assistance rendered was impressive. This was a "no stone unturned" defense. It is therefore inconceivable that, if the defendants were aware of an eyewitness[24] who saw them leave the restaurant and who spoke with them as they departed on the night of the fire, they would not have made some mention of that fact at some point in the tortuous ramping up of this case to the trial or in the trial itself. The record is devoid of any such evidence.

Moreover, as the Government points out (D.I. 142 at 14–15), if Mr. Jochen's affidavit were accurate, then the defendants were aware of Mr. Jochen's status as a witness and the testimony he could give and, thus, any failure to disclose the information could not constitute a *Brady* violation. *See United States v. Pelullo*, 399 F.3d 197, 202 (3d Cir.2005) (noting the "well-established principle that the government is not obliged under *Brady* to furnish a defendant with information which he already has· or, with any reasonable dili-

gence, he can obtain himself") (internal quotation marks and citation omitted).

### 3. *Interest of Justice Generally*

In addition to seeking a new trial on the basis of newly discovered evidence, the defendants also base their Rule 33 motion on the interest of justice generally, arguing that six circumstances from the trial, taken either singly or in combination, should lead to the conclusion that the guilty verdicts were "against the weight of the evidence" (D.I. 116 at 4, 26) and that "a miscarriage of justice has occurred mandating that both defendants receive·a new trial." (*Id.* at 116.) The six circumstances alleged by the defendants are, to paraphrase, (1) the denial of the defendants' efforts to obtain immunity for a defense witness, Richie Bryant, who declined to testify, (2) the manipulation of the testimony of Shawn Naylor regarding the time he left the Yankee Restaurant, (3) the "patently incredible" testimony of prosecution witness Pamela Barrell, (4) the failure of Agent Gemmato to follow investigative leads or write reports, (5) the Government's failure to test certain physical evidence taken from the scene of the fire, and (6) Danielle Donovan's false testimony. (D.I. 116 at 26–43.)

#### a. Richie Bryant

Richie Bryant was a real estate broker who worked with the Learys in obtaining an assignment of the lease for the premises on which the *Yankee* operated. (*See* D.I. 60 at 1–2.) The assignment, as it turned out, was fraudulently created, containing false terms and a forgery in place of the landlord's actual signature. (*Id.*) The defendants sought to compel Mr.

---

23. Agent Gemmato's affidavit states that he interviewed Mr. Jochen on or about October 28, 2002. (D.I. 142 at Ex. 1, ¶ 6.)

24. Since Mr. Jochen swears he was sitting with his girlfriend in her car when he saw the Learys, his girlfriend would presumably have been an additional, corroborating eyewitness.

Bryant to testify at the trial, but their motion for a grant of judicial immunity for him was denied. (*Id.*) During a hearing at trial outside the presence of the jury, Mr. Bryant invoked his privilege against self-incrimination and refused to testify on the specific topics about which the defense wished to inquire. (*See* 4/12/05 Tr. at 23–28.) The defendants now argue that the Government's opposition to their efforts to obtain judicial immunity for Mr. Bryant "distorted the factual record before the jury and effectively deprived the defendants of essential evidence." (D.I. 116 at 26.)

█ Without repeating all of the conclusions reached on the earlier motion for immunity, it suffices to say that the testimony of Mr. Bryant was not essential and its absence did not distort the trial record. Even if Mr. Bryant had testified exactly as the defendants hoped,[25] i.e., he had admitted to falsifying the document and forging the landlord's signature without the Learys' knowledge, that would have confirmed Travis's testimony to the same effect but it would not have addressed the defendants' culpability for the crime of arson. To prove "I am not a forger" does not prove "I am not an arsonist," as the defendants' argument implicitly runs. In short, the hoped for testimony of Bryant went primarily to blunt the implication that the Learys created the false document and to generally support their credibility,[26] as they acknowledge. (*See* D.I. 146 at 15 ("the Government ... ignores the fact that the lease provided the Government with a powerful tool to attack the Leary's [sic]

credibility both on cross examination and in final argument").) It was therefore not exculpatory in a meaningful way and cannot fairly be called essential to the defense. The Government's opposition to the defense request for immunity did not result in a serious danger of a miscarriage of justice and therefore is not a basis for a new trial in the interest of justice. *See Brennan*, 326 F.3d at 189 (new trial warranted only if there is "a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted").

b. Shawn Naylor

The defendants argue that Government agents manipulated the testimony of Shawn Naylor to create the time line the agents desired. (D.I. 116 at 32.) According to the defendants, Agent Gemmato's first interview with Mr. Naylor, which took place shortly after the fire, revealed that Mr. Naylor left the restaurant at 9:45 p.m. (*See supra* at Sec. IV.A.2.a.) When Agent Gemmato interviewed Mr. Naylor again, some sixteen months later, the defendants say he asked questions without giving Mr. Naylor "the benefit of knowing or even seeing what he had stated over a year before." (D.I. 116 at 33.) The defendants contend that, in this way, Agent Gemmato was seeking to obtain "a time reference that fits with his preconceived conclusion and permits it to become the official time line." (*Id.* at 35; footnote omitted.)

█ The problem with this line of argument is that it rests entirely on the defen-

---

25. That was a slim prospect indeed, as it would have required Mr. Bryant to incriminate himself and thus, even if immunized from prosecution, to destroy his personal and business reputation, which, judging from his reaction to being subpoenaed (*see* D.I. 60), he was not in the least inclined to do.

26. Evidence about the forgery went beyond credibility to the extent it supported the Government's implication that Travis fabricated the lease assignment after the arson and that his actions in that regard indicated a consciousness of guilt. (*See* D.I. 116 at 32; 4/18/05 Tr. at 284–85.)

dants' theory of what the notes of the first interview mean. Other than their conjecture, there is nothing to support the assertion that Mr. Naylor ever made any different statement about when he left the restaurant· than the statement he affirmed on the stand at trial. Indeed, when shown the earlier notes and asked by defense counsel if they refreshed or changed his recollection about when he left the Yankee, Mr. Naylor stated flatly, "no." (4/11/05 Tr. at 263–66.) There is not a basis in those notes, particularly in light of the testimony Mr. Naylor actually gave when shown them, for accepting the assertion that the case agent was manipulating Mr. Naylor's testimony.

### c. Pamela Barrell

The defendants claim that Pamela Barrell, a waitress formerly employed at the Yankee, gave testimony that was "riddled with inconsistency" and "defied common sense ...." (D.I. 116 at 35.) Moreover, they assert, her testimony was unsupported by "any objective evidence[,]" and she was lying when she denied being a cocaine user. (*Id.*) In the defendants' view, the jury should have rejected Ms. Barrell's testimony in its entirety. (*See id.*)

Ms. Barrell had worked at the Yankee Restaurant briefly during the time it was owned by the defendants. (4/12/05 Tr. at 36–37.) By the night of the fire, however, she had not worked there for approximately two months. (*Id.* at 37–38.) She testified that on the night of the fire she had been drinking and was going to another restaurant in the same shopping area as the Yankee for more alcohol when, as she passed near the Yankee at approximately 10:25 p.m., she saw Travis Leary's car

parked behind the Yankee. (*See id.* at 49–50.)

Ms. Barrell's statement placing Travis Leary's car, and by inference Travis Leary himself, at the scene of the fire at nearly 10:30 p.m. was the subject of intense defense efforts at impeachment. For example, the defendants were permitted to call to the stand two other waitresses who had worked with Ms. Barrell to try to establish that she was an habitual cocaine user and to thereby imply that she was under the influence of cocaine on the night of the fire and unfit to make the observations she claimed to have made. (4/11/05 Tr. at 273–317.) They called an expert to testify about the effects of cocaine and alcohol on perception. (D.I. 117 at Ex. 70.) They called a private investigator to testify about the distance from the point that Ms. Barrell said she saw Travis's car to the point where she said it was parked and to describe the line of sight and the impediments to observation along that line of sight. (*See id.* at Ex. 71.) Most significantly, they subjected Ms. Barrell to a lengthy and vigorous cross-examination during which they challenged her veracity with, it seemed, every piece of information and every inference at their disposal. (*See* 4/12/05 Tr. at 53–112.) Despite all of this, Ms. Barrell's testimony remained basically consistent with what she had told investigators on the first occasion when she was interviewed a few days after the fire: that she saw Travis's car behind the Yankee at approximately 10:30 p.m.[27]

 On the key aspect of her testimony, then, Ms. Barrell's testimony was not "riddled with inconsistency." It was, on the contrary, in line with the statement she gave to investigators at a time when the evidentiary significance of 10:30 p.m. was

---

**27.** According to the defendants, when she was interviewed on October 30, 2002, she placed

the time that she saw the car at "between 10:30 and 10:40 p.m." (D.I. 116 at 37.)

unlikely to have been apparent to her.[28] Despite the effort to show her as inebriated and suffering the effects of long-term cocaine usage, her testimony was not "patently incredible" or otherwise such that a reasonable fact-finder would be remiss in relying on it. The defense attacks on Ms. Barrell's credibility do not persuade me that there was a miscarriage of justice because of her testimony.

### d. Agent Gemmato

■■■ The defendants complain that Agent Gemmato failed to follow leads that did not support his preconceived notion that the Learys were guilty and that he failed to document with appropriate reports many aspects of the investigation. (D.I. 116 at 40.) As the Government notes in response, however (D.I. 142 at 20), the defendants sounded that theme loudly and repeatedly during the trial. It was given a very thorough airing. The argument ignores the evidence of guilt pointing to the Learys that did not originate with Agent Gemmato. (*See infra* at Sec. IV.A.3.g.) The defendants' complaints about Agent Gemmato's investigation are insufficient to overturn the jury's verdict as a miscarriage of justice.

### e. Evidence Testing

Lastly, and on a closely related note, the defendants contend that Agent Gemmato failed to test evidence discovered at the crime scene and thus, it is implied, the integrity of the prosecution was irreparably compromised. (*See* D.I. 116 at 40; D.I. 146 at 21.) Again, however, as the defendants acknowledge, this was "a major theme of the defense at trial." (D.I. 146 at 21.) Despite that, there was nothing in

the trial that persuaded me that the defendants were denied a fair trial by the mishandling of evidence or the failure to properly follow-up on evidentiary leads. Any human endeavor can, on close inspection, yield a critique pointing out how things might have been done better. That hindsight has revealed things that could have been done but were not is no basis for a new trial in this case.

### f. Danielle Donovan

The defendants add nothing further to the attack mounted on Ms. Donovan in connection with Paul Leary's motion for a new trial based on the newly discovered evidence of the affair between Ms. Donovan and Travis. Having already dealt with that subject at length (*supra* at Sec. IV. A.1.), I note here simply that evidence of the affair does not alter the weight of the evidence in a manner requiring a new trial.

### g. Summary

In sum, none of the foregoing, either singly or in combination, warrants the conclusion that there is "a serious danger that a miscarriage of justice has occurred . . . ." *Brennan*, 326 F.3d 176, 189. The weight of the evidence was not contrary to the verdicts. Three unrelated witnesses, Mr. Naylor, Ms. Donovan, and Ms. Barrell, gave testimony undermining the Learys' alibi and placing one or both of the Learys at the restaurant at the approximate time the fire was set. The alibi the defendants themselves advanced put them together by themselves that night during the time of the fire. Travis, having chosen to testify and put his credibility at issue, admitted to lying under oath on a previous occasion when it suited his purposes. (*See* 4/18/05

---

**28.** Nothing in the evidence indicates that she should have thought it unusual for Travis Leary's car to be parked behind the business he owned and worked at every day. The 10:30 p.m. time of her observation only became significant as evidence of the fire's origin and the defendants' alibi began to later coalesce.

Tr. at 37–40.) The unrebutted evidence of forgery in the creation of the assignment of the lease for the Yankee also cut against the credibility of Travis's testimony. Evidence that he purchased wicks on the day of the fire was substantively damning, and the reason he described for doing so was yet another blow to his credibility.[29] The brothers chose to present themselves as united on all significant issues, so that the blows to Travis's credibility and to their joint alibi landed on Paul as well.

The only believable motive for the fire belonged to the Learys.[30] The timing of Paul's call to the insurance agent and the subsequent insurance increase were suspicious. Travis's inquiries about fire insurance and fires at the shopping center generally and at the Yankee in particular were odd enough to raise suspicion even before the fire.[31] Travis's statement to the landlord's representative that the building was old, in the context of his questions about fire insurance carried by the landlord and his later insistence that the landlord build a new restaurant on the site for the Yankee (see 4/18/05 Tr. at 244–45, 254–55),

added further weight to the motive evidence against the Learys. Evidence of the problems created by the lack of a liquor license and the advantage of having time to acquire one while not having to sell liquor illegally to make ends meet at the restaurant also weighed against the brothers (see 4/8/05 Tr. 170–85), as did the evidence that rent increases they could ill afford were locked into the actual lease governing the property (see id. at 99). Finally, the only ones with access to the building without having to force entry were the Learys. Lending further weight to that opportunity and identity evidence was the record of a phone call between the brothers at or near the time of the fire, indicating planning and coordination.[32] In the face of this evidence, and in the absence of any credible alternative evidence or theory to explain the arson, this case does not warrant taking the extraordinary step of setting aside the jury's verdict.

### B. Motion for Judgment of Acquittal

Paul Leary moves separately for judgment of acquittal, arguing that, "[t]he Government was speculative at best and distinctly unpersuasive.

**29.** Travis testified that, to save money on the small candles used at the tables in the Yankee, he bought the wicks, after talking it over with his brother, with the idea that they could reuse the candle wax. He described his money-saving plan thus: "Just stick a screw driver down into it, put the candle wick down into the light [sic] and you got a brand new candle." (4/18/05 Tr. at 190.) On cross examination; however, he acknowledged that the votive candles used at the Yankee could be purchased for fifty cents a piece and were listed on the store receipt as being "15 hr." candles. (4/19/05 Tr. at 25–28.) A package of wicks cost two to three dollars. (Id. at 28.)

**30.** At various stages (see D.I. 24), the defendants suggested that the Ozdemirs somehow might gain from the fire because they had a claim against the Learys for failing to pay amounts due on the purchase note and wanted to have a pool of cash, i.e., the insurance proceeds, against which to collect. This argu-

**31.** As previously noted (supra at Sec. II), the landlord's representative was sufficiently taken aback by her conversation with Travis on those topics that she said she'd never had a conversation like it in over thirty years in the business and that she immediately commented on it to her co-workers and made a note of it for her office file.

**32.** Travis explained a cell phone call he received from Paul shortly after 11:00 p.m. by saying that Paul called him just to give assurance that he'd gotten home safely after the short drive from Travis's house to Paul's. (See 4/18/05 Tr. at 326–27; 4/19/05 Tr. at 14–16.) That represents such an extraordinary level of concern and solicitude between the brother's that one may think it unlikely to be true.

ernment's case against [him] hangs almost totally upon the testimony of Pamela Burrell, Danielle Donovan, and Shawn Naylor." (D.I. 116 at 44.) "Absent the testimony of these three individuals," Paul continues, "the Government has no case against [him]." (*Id.*) Paul concedes, however (*id.* at 6), as he must, that in this context I am bound to view the evidence "in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *Brodie*, 403 F.3d at 133 (internal quotation marks and citations omitted). He further concedes that if I do not reject the testimony of those three witnesses, "it is unlikely [the court] will conclude that a rational trier of fact could not have found guilt." (D.I. 116 at 44 .)

He is right. I do not reject the testimony of those witnesses because, in this context, I am not permitted to. *Brodie*, 403 F.3d at 133. Given the state of the record as outlined above, including the testimony of those witnesses, I cannot say that no rational jury could have found guilt beyond a reasonable doubt. I know that this is hard for Paul Leary and his family to bear,

but the standard is what it is and does not allow me to second guess the diligent and conscientious work done by the jury.[33]

## V. Conclusion

Based on the foregoing reasons and authorities, the defendants' motions will be denied. An appropriate order will follow.

### *ORDER*

For the reasons set forth in the Court's Memorandum Opinion of today's date,

IT IS ORDERED that Defendants' post-conviction motions (D.I.116) are DENIED.

---

**33.** Circumstances that developed during and immediately after the trial, which I need not detail here, prompt me to emphasize the respect due the jury's verdict. The conviction of Paul and Travis Leary has been and will, no doubt, continue to be a terrible burden for them and their loved ones. The Learys are, by all accounts and appearances, an especially close-knit family. I have received many letters from family members and from the family's network of friends, highlighting the toll this case has taken and noting disbelief that the defendants could have committed the crimes for which they were convicted. Given the volume and obvious sincerity of the pleading by these family members and friends, it is proper to acknowledge their letters and to give the assurance that I have read what has been sent to me and will do so again when it becomes my unhappy responsibility to sentence the Leary brothers. While it will give no comfort, I must also acknowledge, however, that virtually every felony case involves shattered hopes and broken hearts. By definition, someone is accused of violating serious societal norms, and, if there is a conviction, jail time is a distinct possibility. In this case, the devotion of the defendants' family was on more constant display than in many cases, and the distress at the verdict was more explosively expressed. But, for all of that, the case is only unique in the sense that it is uniquely painful to the defendants and to the family and friends who love them. Like all cases, it must be dealt with according to applicable legal standards, not the passions of any party, no matter how intensely and honestly felt. In this way we do our utmost to vouchsafe justice for all who come before our nation's courts.